

CC615630

| SUMMONS AND ORDER OF NOTICE | DOCKET NUMBER **2581CV03118** | **Trial Court of Massachusetts** **The Superior Court** |
|---|---|---|
| CASE NAME: **Coleman, Rory M vs. City of Boston et al** | | RECEIVED CITY CLERKS OFFICE Michael A. Sullivan, Clerk of Court Middlesex County 2025 DEC 24 P 1: 32 BOSTON, MA |
| To: **City of Boston** | FORWARDED BY THE CITY CLERK TO THE DEC 2 4 2025 LAW DEPARTMENT | COURT NAME & ADDRESS Middlesex County Superior Court - Woburn 200 Trade Center Woburn, MA 01801 |

To the above named defendant(s):

You are hereby summoned and required to serve upon:

**Rory M Coleman**
**P.O.Box 590236**
**Newton Centre, MA 02459**

an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Woburn either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Preliminary Injunction has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

**Date: 12/29/2025**

**Time: 12:00 PM**

**Session/ Courtroom Location:**

**Event Type: In Person**

**Courtroom 620**

A true copy Attest:

12-24-25

*Terrance Williams*

Deputy Sheriff Suffolk County

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED **12/23/2025** | CHIEF JUSTICE OF THE SUPERIOR COURT Witness: **Hon. Michael D Ricciuti** | ASSOCIATE JUSTICE **Hon. Emily A Karstetter** | ASSISTANT CLERK X |
|---|---|---|---|
| **RETURN OF SERVICE** | | | |
| I hereby certify and return that on _____, I served a copy of this summons, together with a copy of the Complaint. | | | |
| | | PARTY NAME: X | |

**COMMONWEALTH OF MASSACHUSETTS**
**MIDDLESEX, SS. SUPERIOR COURT DEPARTMENT**

RECEIVED
CLERK'S OFFICE

CIVIL ACTION NO.

25 DEC 24 P 1: 32

BOSTON, MA

RORY M. COLEMAN,
    *Plaintiff,*

v.

CITY OF BOSTON; BOSTON POLICE DEPARTMENT;

MAYOR MICHELLE WU, in her official capacity;

COMMISSIONER MICHAEL COX, in his official capacity;

DEPUTY SUPERINTENDENT MILLER, individually;

CAPTAIN RICHARD OSBERG, individually;

SERGEANT PAUL ZELVIS, individually;          RECEIVED    12/17/25    tc

SERGEANT MARK TOBIN, individually;

LIEUTENANT STEVEN CICCOLO, individually;

SERGEANT DETECTIVE LEAH BAGAS, individually;

NATASHA GUMBS-LEVITY, ESQ., individually;

GINA EDGE-O'LEARY, individually;

SHARON DOTTIN, individually;

LISA O'BRIEN, individually;

JOHN/JANE DOE, the individual(s) who drafted and/or

approved the POST Commission submission,
    *Defendants.*

**COMPLAINT FOR DECLARATORY, INJUNCTIVE,**

**AND MONETARY RELIEF**

Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 149, § 185 (Treble Damages)

Mass. Gen. Laws ch. 12, §§ 11H, 11I

Mass. Declaration of Rights arts. I, X, XII, XVI

**JURY TRIAL DEMAND**

## I. PRELIMINARY STATEMENT

1. This is a civil rights and employment discrimination action brought by a nineteen-year
   veteran Boston Police Officer who reported that his supervisor sexually assaulted him.

2. What followed was a three-year campaign of escalating retaliation: two Internal Affairs
   Division ("IAD") cases opened against the plaintiff/victim rather than the
   defendant/perpetrator; phone seizure; discriminatory IAD questioning; denial of
   accommodations; an involuntary retirement application containing seven (7)  provably
   false statements; a direct statement from command that Plaintiff was being forced out
   "because of what Michelle Wu wanted"; sustained discipline in IAD Case 2022-0495, a
   case City of Boston ("City") has admitted was based on an error in recording the
   complaint; and Peace Officer Standards and Training ("POST") Commission reporting of
   IAD Case 2022-0505 using inflammatory language not found in any Boston Police
   Department ("BPD" "Department") document, which damaged Plaintiff's permanent
   licensing record before he ever had notice or a hearing.

3. City has admitted the core facts that prove its cases against Plaintiff were mishandled in
   its Massachusetts Commission Against Discrimination ("MCAD") Position Statement.
   City admitted: (1) "there was an error made by IAD in recording the complaint made by
   Sgt. Zelvis" (Ex. 1 para. 38), referring to IAD Case 2022-0495; and (2) "Sgt. Tobin found
   Officer Coleman's phone on his desk, recording, and confiscated it" (Ex. 1 para. 42),

referring to IAD Case 2022-0505. Despite these binding admissions, City sustained charges in both cases.

4.  The retaliation has extended to Plaintiff's permanent licensing record. BPD reported findings from IAD Case 2022-0505 to the POST Commission using inflammatory language that appears in no prior BPD document, characterizing Plaintiff's recording of workplace harassment as conduct within a "restricted space" and as a "felony." Neither phrase appeared in any IAD document; this language was fabricated specifically for public dissemination. Plaintiff received no notice or any hearing before this damaging characterization appeared on Plaintiff's permanent certification record.

5.  Critically, the recording at issue was made with Plaintiff's BPD-issued work phone, department-issued equipment, in plain view on his desk. Sgt. Tobin observed the phone recording before seizing it, a fact City admitted. The recording was therefore not "secret" within any reasonable meaning of that term. Under Massachusetts's own precedent, a recording is not "secret" when the recording device is held "in plain sight." Moreover, BPD has no written policy prohibiting audio recording in the Crime Scene Response Unit ("CSRU"). Other officers in the same unit routinely recorded with cell phones and video cameras, desk phone lines recording calls, and body-worn cameras were standard equipment. That an officer using department-issued equipment to document workplace harassment in a common area could be characterized as committing a "felony" defies both law and logic.

6.  Plaintiff is not an outlier. In recent years, City has paid more than $7.2 million in judgments and settlements arising from similar allegations that BPD employees who had reported misconduct by supervisors were subjected to retaliation and career-ending adverse actions. Two juries have returned seven-figure verdicts while other cases remain

pending. These cases show a persistent pattern: an officer reports misconduct, IAD and

the chain of command are turned against the reporting officer, and the perpetrator/BPD

Officer is protected.

7. Plaintiff brings this action under Mass. Gen. Laws ch. 151B (sexual harassment, hostile

work environment, discrimination based on sexual orientation, disability, and retaliation),

Mass. Gen. Laws ch. 149, § 185 (whistleblower retaliation with treble damages), Mass.

Gen. Laws ch. 12, §§ 11H, 11I (Massachusetts Civil Rights Act or "MCRA"), and the

Massachusetts Declaration of Rights. The Plaintiff seeks declaratory relief, injunctive

relief halting the forced retirement and correction of the POST record, along with

monetary damages in the form of compensatory, trebled, and punitive damages.

## II. JURISDICTION, VENUE, AND EXHAUSTION

8. This Court has jurisdiction over Plaintiff's claims under Mass. Gen. Laws ch. 151B, § 9,

Mass. Gen. Laws ch. 149, § 185, Mass. Gen. Laws ch. 12, §§ 11H, 11I, the Massachusetts

Constitution, and common law.

9. Venue is proper in Middlesex County under Mass. Gen. Laws ch. 223, § 1. Plaintiff

resides in Newton Centre, Middlesex County, and a related Helping Expand Retirement

Opportunities for First Responders Act ("HERO Act") appeal, *Coleman v. Boston

Retirement System*, No. 2581CV02968 (Middlesex Super. Ct.), arising from the same

pattern of retaliation, is pending in this Court.

10. On December 30, 2022, Plaintiff filed a charge of discrimination and retaliation with

MCAD (Case No. 22BEM03412), which was cross-filed with the Equal Employment

Opportunity Commission ("EEOC") (Charge No. 16C-2023-00854). Plaintiff amended

the charge on November 17, 2023. Plaintiff has satisfied all administrative prerequisites

under Mass. Gen. Laws ch. 151B, § 9. Plaintiff is preparing a subsequent MCAD

complaint to address continuing violations occurring in 2024 and 2025, which arise from the same pattern of harassment and retaliation alleged in the 2022–2023 charges. Plaintiff alleges a continuing pattern of retaliation extending through the present day, including, but not limited to sustained discipline in September 2025 (despite City's admission of error); threats of discharge in October 2025; publication of false POST characterizations on or about November 2025; and ongoing involuntary retirement proceedings in December 2025. Under the continuing violation doctrine, all acts alleged from April 2022 through the present are part of a single ongoing pattern of discrimination and retaliation, and the statute of limitations does not begin to run until the last act in the pattern. All claims alleged herein are timely filed.

11. Plaintiff expressly reserves the right to amend this if necessary.

### III. PARTIES

**A. Plaintiff**

12. Plaintiff Rory M. Coleman is a resident of Newton Centre, Middlesex County. He has been employed as a Boston Police Officer since November 27, 2006 (Badge No. 1419, Employee ID 102172).

13. Plaintiff is an openly gay man. Sexual orientation is a protected category under Mass. Gen. Laws ch. 151B, § 4(1).

14. Plaintiff has been diagnosed with Post-Traumatic Stress Disorder ("PTSD") by City's own Employee Assistance Program ("EAP") counselor. This disability was caused directly by sexual assaults by Sgt. Zelvis, witness intimidation through phone seizure by Sgt. Tobin, and repeated incidents in which Plaintiff was escorted off BPD property after reporting misconduct, first by Sgt. Farrell at District C-6 on Lt. Ciccolo's orders, then by Sgt. Tobin, Sgt. Cazeau, and Sgt. Zelvis at Crime Scene Response Unit ("CSRU").

15. Plaintiff is a qualified individual with a disability within the meaning of Mass. Gen. Laws ch. 151B, § 1(17), who can perform the essential functions of his position with or without reasonable accommodation, as demonstrated by his consecutive months of successful performance at District D-14 and active POST certifications in both Massachusetts and California. The Department that caused his injury now seeks to use that injury as grounds for forced retirement.

16. Plaintiff holds an active POST certification from the Commonwealth of Massachusetts through July 1, 2028, with no limitations, conditions, or restrictions. He also holds an active California POST certification through October 6, 2026. Independent licensing authorities in two states have found him fit to perform police duties.

**B. Defendants**

17. Defendant City is a municipal corporation organized under the laws of the Commonwealth of Massachusetts and is Plaintiff's "employer" within the meaning of Mass. Gen. Laws ch. 151B, § 1(5) and Mass. Gen. Laws ch. 149, § 185.

18. Defendant BPD is a department of City responsible for law enforcement services and operates as an arm of City.

19. Defendant Mayor Michelle Wu is the Mayor of Boston and its chief executive officer. She is sued in her official capacity for prospective injunctive and declaratory relief.

20. Defendant Commissioner Michael Cox is the Commissioner of BPD. He is sued in his official capacity for prospective injunctive and declaratory relief.

21. Defendant Deputy Superintendent James W. Miller is a BPD command-level officer who sustained disciplinary charges against Plaintiff despite City's written admission of error in

the underlying IAD case. Miller is sued in his individual capacity pursuant to Mass. Gen. Laws ch. 151B, § 4(5).

22. Defendant Captain Richard Osberg stated that Plaintiff's forced retirement was "because of what Michelle Wu wanted." Osberg is sued in his individual capacity pursuant to Mass. Gen. Laws ch. 151B, § 4(5).

23. Defendant Sergeant Paul Zelvis is a BPD supervisor who sexually harassed and sexually assaulted Plaintiff. Zelvis is sued in his individual capacity pursuant to Mass. Gen. Laws ch. 151B, § 4(5).

24. Defendant Sergeant Mark Tobin seized Plaintiff's phone from his desk while it was recording workplace conditions. Tobin is sued in his individual capacity pursuant to Mass. Gen. Laws ch. 151B, § 4(5).

25. Defendant Lieutenant Steven Ciccolo subjected Plaintiff to discriminatory treatment including hostile language and denial of patrol vehicles. Ciccolo is sued in his individual capacity pursuant to Mass. Gen. Laws ch. 151B, § 4(5).

26. Defendant Sergeant Detective Leah Bagas asked Plaintiff "How do we know you are gay?" during an IAD interview on or about July 8, 2024. Bagas is sued in her individual capacity pursuant to Mass. Gen. Laws ch. 151B, § 4(5).

27. Defendant Natasha Gumbs-Levity, Esq., is or was Acting Director of Human Resources ("HR") with personal involvement in Plaintiff's disability accommodation requests. Gumbs-Levity, Esq. is sued in her individual capacity pursuant to Mass. Gen. Laws ch. 151B, § 4(5).

28. Defendants Gina Edge-O'Leary, Sharon Dottin, and Lisa O'Brien each signed the involuntary retirement application under the pains and penalties of perjury, certifying that

seven (7) provably false statements were "true, complete and accurate." Edge-O'Leary,
Dottin, and O'Brien are sued in their individual capacities pursuant to Mass. Gen. Laws
ch. 151B, § 4(5).

29. Defendants John/Jane Doe are the individual(s) who drafted and/or approved the POST
Commission submission containing defamatory characterizations of Plaintiff's conduct,
including the fabricated "restricted space" language and the false "felony"
characterization. Their identities will be determined through discovery and public records
requests. Doe(s) are sued in their individual capacities.

## IV. CHRONOLOGICAL STATEMENT OF FACTS

### A. Phase I: Plaintiff's Background and Service (2006--Early 2022)

30. On November 27, 2006, Plantiff began his career as a Boston Police Officer. Plantiff has
served continuously for nineteen (19) years.

31. Throughout his career, Plaintiff has received commendations for his work, including a
January 2023 commendation for "high ideals of professionalism and teamwork"
following a traumatic crime scene involving the frozen bodies of infants found in a
freezer.

32. Plantiff is an openly gay man. Plantiff's sexual orientation is known to his supervisors
and coworkers and is documented in his MCAD filing and internal HR records.

### B. Phase II: Early Discrimination by Lt. Ciccolo (April--May 2022)

33. On or about April 18, 2022, while assigned to District C-6, Defendant Lt. Steven Ciccolo
called Plaintiff, an openly gay man, "insane," "crazy," "sneaky," "disgusting," and "gross"
in a hostile and demeaning manner. Plaintiff reasonably interpreted these words as
targeted attacks on his sexual orientation. Words such as "disgusting" and "gross," when

directed at an openly gay person by a supervisor, carry unmistakable connotations of anti-LGBTQ+ bias and create a hostile work environment.

34. During this period, Ciccolo also denied Plaintiff patrol vehicles while assigning them to heterosexual officers with less seniority or on overtime from other districts and manipulated sick time and overtime to punish Plaintiff.

35. Lt. Ciccolo had been abusive to Plaintiff prior to the Form 26 reports, but after Plaintiff filed those reports, Ciccolo's abuse escalated dramatically, occurring daily and sometimes multiple times per day. Ciccolo would demand additional reports and berate Plaintiff. On one occasion, Lt. Ciccolo abruptly stood up, lunged at Plaintiff with clenched fists in a bladed stance, and leered at Plaintiff as if he was going to physically assault him over a report Ciccolo incorrectly assumed had not been completed. When Plaintiff attempted to correct him and advised he would continue the conversation after Ciccolo calmed down, Plaintiff left the supervisor's office and went to his patrol vehicle in the rear parking lot of District C-6 to continue his tour of duty. Lt. Ciccolo then got on his radio and ordered Plaintiff back into the station. After returning to the station Plaintiff asked Lt. Ciccolo whether the adverse treatment was due to his sexual orientation. Lt. Ciccolo ordered Sgt. Farrell to escort Plaintiff off the property. Sgt. Farrell complied. Plaintiff was subsequently transferred to CSRU by personnel order.

36. On or about November 05, 2022, after Plaintiff completed the fingerprint certification module with a perfect score, Sgt. Det. Cazeau, a member of the Boston Police Stress Unit, called Plaintiff and stated with evident hostility: "You PASSED with a 100%!?" The statement was not congratulatory. Cazeau's tone reflected surprise and displeasure that Plaintiff had succeeded. This interaction predated the December 2022 events and

demonstrates that Cazeau harbored animus toward Plaintiff before participating in his removal from CSRU.

**C. Phase III: Sexual Assault by Sgt. Zelvis and Institutional Abandonment (December 2022 - February 2023)**

37. Beginning in late 2022, while assigned to CSRU, Defendant Sergeant Paul Zelvis engaged in a pattern of escalating sexual harassment and sexual assault against Plaintiff. The incidents included:

(a) On multiple occasions, Sgt. Zelvis positioned himself inches from Plaintiff while Plaintiff was seated at his desk working on case files, including a homicide folder. Sgt. Zelvis would exit the supervisor's office and work his way closer to Plaintiff with small, deliberate steps, a pattern of predatory behavior he had repeated before, until his crotch was inches from Plaintiff's face, arm, and back.

(b) Sgt. Zelvis ate food in a sexually suggestive manner in Plaintiff's presence, slurping and sucking his fingers while watching Plaintiff, while simultaneously ordering Plaintiff to a video team assignment at District C-6, where Lt. Ciccolo was still assigned. Sgt. Zelvis would sing "We're Not Gonna Take It" by Twisted Sister in Plaintiff's presence and openly discuss socializing with detectives and supervisors from District C-6, signaling to Plaintiff that Sgt. Zelvis was connected to the same personnel who had previously mistreated him and that resistance would be futile.

(c) When Plaintiff attempted to retrieve supplies from the CSRU supply room, Sgt. Zelvis stepped inches from Plaintiff, attempted to press his genitals against Plaintiff's body, and breathed into Plaintiff's face and mouth as if he intended to kiss him. When Sgt. Zelvis said, "I will go with you," Plaintiff recognized that Sgt. Zelvis was attempting

to isolate him in a room where he could not escape or call for help. Plaintiff stepped

back and gave Sgt. Zelvis the key to complete the task alone.

(d) On one occasion when Plaintiff was standing outside the CSRU building, Sgt. Zelvis

physically pushed two officers out of his way to reach Plaintiff. This aggressive

pursuit demonstrates that Sgt. Zelvis's conduct was not inadvertent or coincidental—it

was targeted, predatory behavior. City later admitted in its MCAD Position Statement

that IAD made an "error" in recording this incident, having falsely recorded that

Officer Coleman was inside the building when he was in fact outside. (Ex. 1 para. 38.)

(e) When Plaintiff finally summoned the courage to speak up and request that Sgt. Zelvis

respect his boundaries, Sgt. Zelvis responded with antagonism—dismissing his

behavior as innocuous, such as claiming he was "just getting water," and using his

supervisory authority to pressure other CSRU personnel to characterize incidents

favorably to himself.

38. This conduct constituted sexual harassment and sexual assault under Massachusetts law.

Sgt. Zelvis exploited his supervisory authority to engage in predatory behavior, attempted

to isolate Plaintiff, and retaliated when Plaintiff asserted boundaries.

39. On or about December 18, 2022, Plaintiff reported Sgt. Zelvis's conduct by Form 26 to

his chain of command.

40. On or about December 19, 2022, within twenty-four (24) hours of Plaintiff's report, IAD

opened IAD Case 2022-0495 against Plaintiff, not against the supervisor he accused. The

supervisor accused of sexual assault was treated as a complainant; the officer who

reported the assault was treated as the subject.

41. The IAD complaint notification recorded Sgt. Zelvis's account as follows: "Sgt. Zelvis

was inside of the CSRU and was getting water from the water machine. Police Officer

("PO.") Coleman then informed Sgt. Zelvis that he believed Sgt. Zelvis was standing too close to him, which was making him feel uncomfortable. Sgt. Zelvis informed PO. Coleman he was simply getting water." This characterization completely omits Sgt. Zelvis's pattern of positioning his crotch at Plaintiff's head level, his sexually suggestive conduct, and his physical pursuit of Plaintiff. City later admitted this was an "error." (Ex. 1 para. 38.)

42. When Plaintiff expressed distress after confronting Sgt. Zelvis about the sexual assaults, the departmental response was to frame the victim as the threat. Officer Michael O'Dwyer retrieved his firearm from a security locker, not to protect Plaintiff, but because he characterized Plaintiff's distress as dangerous. O'Dwyer wrote in his Form 26: "Prior to this incident I didn't feel comfortable with Officer Coleman around due to previous stories at other stations. Officer Coleman's behavior is erratic and unpredictable." Officer Jenna Hawkins stated: "PO Coleman made me feel uncomfortable and extremely stressed. I have never witnessed anyone being so unreasonable and confrontational." Neither O'Dwyer nor Hawkins witnessed the underlying sexual assaults by Sgt. Zelvis. They witnessed only Plaintiff's distress response. The Department had body cameras available across the hall, EAP services, the BPD Stress Unit, and support protocols. None of these services and units were deployed to help Plaintiff.

**D. Phase IV: The Self-Preservation Recording (December 29, 2022)**

43. By December 29, 2022, Plaintiff had filed multiple Form 26 statements reporting harassment and discrimination between May and December 2022, met with BPD Human Resources, contacted City Office of Human Resources ("OHR"), and verbally reported the harassment to Lt. Det. Connolly, Sgt. MacLaughlan, and the Captain's clerk during the time Plaintiff was assigned to CSRU.

44. Plaintiff had been informed by Diane Belfast of City OHR that "no investigation team" was available to help. Plaintiff remained assigned to the same unit, same shift, under the supervision of the sergeant who had sexually assaulted him. No protective action had been taken.

45. Unlike body-worn cameras, which continuously buffer footage and save when activated, cell phones must already be recording to capture events as they occur. Plaintiff could not predict when Sgt. Zelvis would next position his genitals near Plaintiff's face. Plaintiff could not continuously leave the unit each time Sgt. Zelvis approached. Body cameras were available across the hall, but they were not deployed to protect Plaintiff. EAP and Boston Police Stress Unit services, which Sgt. Det. Cazeau was a member of existed but were not offered. Supervisory intervention protocols existed but were not followed. Having exhausted every institutional avenue for protection, Plaintiff's BPD-issued work phone on his desk was his only means of documenting ongoing abuse.

46. On or about December 29, 2022, Plaintiff had his BPD issued work phone on his desk in the CSRU common area. The phone was department equipment, visible to anyone present. Plaintiff's employee ID number (102172) was written in white marker on the black phone case. It was not hidden. Sgt. Tobin observed the phone recording before seizing it. City admitted this fact in its MCAD Position Statement: "Sgt. Tobin found Officer Coleman's phone on his desk, recording, and confiscated it." (Ex. 1 para. 42.) Because Sgt. Tobin observed the phone recording before seizing it, the recording was not "secret" within any reasonable meaning of that term.

47. There is no BPD rule prohibiting audio recording in CSRU. Plaintiff reviewed BPD Rules 100-407; none address this conduct. Other officers used cell phones freely in the unit. Officers routinely used video cameras to record incident cards and other documentation

within CSRU, the same space BPD now characterizes as "restricted." Departmental phone lines record calls. Body-worn cameras were standard equipment. The selective characterization of Plaintiff's visible phone as criminal recording, while ignoring routine recording by other officers using video cameras in the identical space, demonstrates that the "restricted space" designation was fabricated to target Plaintiff specifically.

**E. The Phone Seizure: Four Independent Constitutional and Statutory Violations**

48. Sgt. Tobin seized Plaintiff's department-issued cell phone from Plaintiff's desk without Plaintiff's consent, without a warrant, and without any lawful justification. The seizure was unlawful under four independent constitutional and statutory provisions:

   (a) **Fourth Amendment / Article XIV - Warrantless Seizure of a Cell Phone.** There was no arrest. There was no exigency. There was no consent. Tobin seized Plaintiff's phone based solely on his post-hoc discovery that it was recording, a discovery he made only by handling the phone without authorization. Under Massachusetts law, Article 14 of the Massachusetts Declaration of Rights provides even broader protection than the Fourth Amendment. The seizure violated both the Fourth Amendment and Article 14.

   (b) **First Amendment / Article XVI - Retaliation for Protected Recording Activity.** The First Circuit has repeatedly held that recording police officers in the discharge of their duties is protected by the First Amendment. The court held that the First Amendment protects such recording because it serves "core First Amendment values" of government accountability. If secret recording of government officials is constitutionally protected, then visible recording, as occurred here, is necessarily protected. Plaintiff recorded supervisors engaged in official duties in a government

workplace. The seizure of Plaintiff's recording device, immediately after he filed

Form 26 complaints, constitutes retaliation for protected First Amendment activity.

(c) **Equal Protection / Article I - Selective Enforcement.** Other officers in CSRU used

cell phones and video cameras to record without obtaining consent. No phones were

seized. No video cameras were confiscated. No IAD complaints were filed. Plaintiff,

the only openly gay officer who had filed harassment complaints, was singled out for

enforcement. The Equal Protection Clause prohibits selective enforcement of facially

neutral rules when the selection is based on impermissible criteria such as race,

religion, sexual orientation, or exercise of constitutional rights. Plaintiff was treated

differently from other CSRU officers who recorded. The only rational explanation for

this differential treatment is Plaintiff's sexual orientation and his protected complaints.

(d) **Witness Intimidation - Mass. Gen. Laws ch. 268, § 13B and 18 U.S.C. § 1512.**

Plaintiff had filed Form 26 statements on or about December 18 and 28, 2022,

reporting sexual harassment by Sgt. Zelvis. Plaintiff had contacted City OHR on

December 27, 2022. By December 29, 2022, it was clear that internal remedies had

failed. OHR had told Plaintiff "no investigation team" was available, and he remained

under the supervision of his abuser. Sgt. Tobin knew Plaintiff was a complainant who

had exhausted internal channels and would inevitably seek external relief through

MCAD and EEOC. The seizure of Plaintiff's phone on December 29, 2022, one day

before Plaintiff filed his MCAD complaint on December 30, 2022, was designed to

prevent Plaintiff from preserving evidence for the external complaint they knew was

imminent. Under Massachusetts law, witness intimidation occurs when a person

"willfully endeavors by means of… intimidation... or any act of obstruction... to

impede, obstruct, delay, harm, punish or otherwise interfere with... a witness or

potential witness." Mass. Gen. Laws ch. 268, § 13B(1)(c). Plaintiff was a potential

witness in his own forthcoming MCAD proceeding. The seizure was designed to prevent Plaintiff from preserving evidence. This constitutes witness intimidation and obstruction of justice under both state and federal law.

49. The seizure occurred within 24 hours of Plaintiff's December 28, 2022, Form 26 reporting Sgt. Zelvis's sexual assault, and one day before Plaintiff filed his MCAD complaint. This timing is not coincidental. The message was clear: when you attempt to document abuse, we will seize your evidence, open an investigation against you, and escort you from the building. This is the definition of witness intimidation, and it worked exactly as intended.

50. City's characterization of Plaintiff's recording as "secret" is logically incompatible with its own evidence and with binding Massachusetts precedent. In City's MCAD Position Statement (Ex. 1, Att. W - Sgt. Det. Cazeau's Form 26), City's own witness admitted the phone was "face down on the left side of the desk." If the phone was face down, the screen was not visible. If the screen was not visible, Sgt. Tobin could not have observed it was recording until he picked it up and turned it over, meaning he handled Plaintiff's property before he had any lawful basis to believe recording was occurring. City cannot have it both ways: if the phone was "secret" because it was face down, then Tobin had no basis to seize it; if Tobin knew it was recording before he picked it up, then it was not secret. Either Tobin committed an unlawful seizure without probable cause, or there was no "secret" recording. Both narratives cannot coexist. City submitted the evidence that defeats its own case.

51. A department-issued phone, marked with Plaintiff's employee identification number, sitting openly on his desk in a common area where other officers used phones and video cameras freely, is in plain sight. It is not "clandestine surveillance." The "felony" characterization was not a legal conclusion; it was a weapon.

52. Following the seizure, IAD opened IAD Case 2022-0505, and Plaintiff was escorted from the building by Sgt. Tobin, Sgt. Cazeau, and Sgt. Zelvis, the very supervisor Plaintiff had reported for sexual assault. The plaintiff/victim was removed. The defendant/perpetrator remained. The witness was silenced. The evidence was seized.

53. **The "Secret" Recording That Was Not Secret:** Sgt. Det. Cazeau's own Form 26 states that Plaintiff's phone was "laying down in the workstation" and that he "observed that the department issued phone was in a case [that] had the numbers 102172 on the back." Sgt. Tobin's Form 26 states he "observed Officer Coleman's department issued cell phone face down on his workstation." A phone lying on a desk, visible to anyone who walked by, with Plaintiff's employee ID number written in white marker on a black case, is not "secret." A phone that Sgt. Tobin picked up and turned over is not "hidden." City later admitted in its MCAD Position Statement that "Sgt. Tobin found Officer Coleman's phone on his desk, recording, and confiscated it." The word "found" confirms the phone was visible. A recording device "held... in plain sight" does not trigger Mass. Gen. Laws ch. 272, § 99.

54. **Sgt. Tobin's Documented Animus:** In his Form 26 dated December 29, 2022, Sgt. Tobin stated: "I no longer feel comfortable supervising Officer Coleman. I have documented three prior incidents and this being the fourth." Plaintiff was never informed of those three prior incidents, never given an opportunity to respond to them, and never disciplined for them. On information and belief, those undisclosed "incidents" consist of Plaintiff's protected activity: reporting sexual harassment by Sgt. Zelvis, asserting boundaries when Sgt. Zelvis invaded his personal space, and existing as an openly gay man who refused to tolerate abuse in silence. If Sgt. Tobin's discomfort arose from supervising an officer who reported misconduct and demanded dignity, his participation in the phone seizure constitutes retaliation—not legitimate supervision.

55. December 30, 2022: Plaintiff filed a comprehensive charge with MCAD (Docket No. 22BEM03412), alleging sexual harassment, discrimination based on sexual orientation, and retaliation. The charge was cross-filed with EEOC (Charge No. 16C-2023-00854).

**F. Phase V: IAD Case 2022-0505 - The Recording Investigation (February 2023)**

56. On or about February 7, 2023: Plaintiff appeared for the IAD Case 2022-0505 interview conducted by Sgt. Det. Erin Schroeder-Withington. Boston Police Patrolmen's Association ("BPPA") provided Attorney Kenneth Anderson was present as counsel.

57. During this interview, Sgt. Det. Schroeder-Withington asked Plaintiff whether he understood that recording another person without their knowledge "constituted a felony" and whether he understood "dual consent laws." The investigators never informed Plaintiff, or asked whether he knew, that the First Circuit has held that the Massachusetts wiretap statute cannot be applied to criminalize recording police officers discharging their official duties. Nor did they inform Plaintiff that, a recording device "in plain sight" does not constitute "secret" recording under Mass. Gen. Laws ch. 272, § 99. This selective framing was designed to elicit a particular answer and does not reflect Plaintiff's actual understanding of his legal rights.

58. The "felony" characterization is false as a matter of law. The recording was not secret, Plaintiff's phone was visible on his desk. Even if it had been secret, it would have been constitutionally protected under case law. The investigators' failure to acknowledge this legal landscape, combined with the fact that Plaintiff's phone was visible (not hidden) and that BPD has no written policy prohibiting such recording, demonstrates that the "felony" characterization was not merely questionable, it was wrong.

59. Attorney Anderson, present at this interview, cited only *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011), and failed to cite *Project Veritas*, *Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014),

or the "plain sight" language in *Commonwealth v. Hyde*, 434 Mass. 594, 750 N.E.2d 963

(2001). This failure to raise relevant precedent allowed the false "felony" characterization

to proceed unchallenged.

### G. Phase VI: PTSD Leave and City's Investigation Failures (2023)

60. On or about February 23, 2023, due to severe PTSD resulting from the sexual assaults,

hostile work environment, and departmental response, Plaintiff took a Family and

Medical Leave Act ("FMLA") leave.

61. On or about May 15, 2023, Labor Counsel Kevin S. McDermott completed an

investigation memorandum concerning Plaintiff's complaints of sexual orientation

discrimination. The memorandum's "LEGAL STANDARDS" section cited cases from the

1970s, 1980s, 1990s, and 2000s but conspicuously omitted *Bostock v. Clayton County*,

590 U.S. 644 (2020), the landmark decision holding that discrimination based on sexual

orientation constitutes sex discrimination. *Bostock* was decided nearly three years before

City completed its investigation.

62. On or about May 17, 2023, City issued its formal closure letter finding "no violation of

City policy." This letter was issued on International Day Against Homophobia, Biphobia

and Transphobia.

### H. Phase VII: Return to Work and the Sexual Orientation Interrogation (May 2024 - February 2025)

63. On or about May 1, 2024, Plaintiff returned to work on modified duty at District D-14

after approximately fourteen (14) months on FMLA leave. Plaintiff's leave was approved

through proper channels for PTSD diagnosed by BPD's own Employee Assistance

Program counselor and confirmed by his treating physicians.

64. On or about May 1, 2024, through the present, Plaintiff has worked continuously at District D-14 on modified duties. For eighteen (18) consecutive months, work records and emails show he successfully performed his assigned tasks, including front desk work and IAD intake, with no discipline or negative performance documentation.

65. Despite his successful performance and active POST certifications in two states, BPD has withheld Plaintiff's firearm, radio, and department phone for over eighteen (18) months. Although BPD has eventually scheduled Plaintiff for firearms requalification in February 2026, the Department has still not returned his firearm making his requalification impossible. The Department cannot simultaneously claim Plaintiff is unfit for duty while scheduling him for requalification and cannot schedule requalification while withholding the firearm required to complete it. This administrative contradiction reveals that the goal is not legitimate personnel management, but continued obstruction designed to manufacture grounds for termination.

66. On or about July 8, 2024, during an IAD interview, sixteen (16) months after the February 7, 2023, interview regarding IAD Case 2022-0505, Defendant Sgt. Det. Leah Bagas asked Plaintiff: "How do we know you are gay?" This question served no legitimate investigative purpose and directly challenged Plaintiff's protected status. The question was discriminatory on its face; no heterosexual officer would be asked to prove their sexual orientation during an IAD interview. Bagas's question implied that Plaintiff's sexual orientation required proof that his identity was suspect until verified. This is textbook sex stereotyping.

67. On or about August 20, 2024, Plaintiff filed a complaint with the Massachusetts POST Commission (Complaint #8986) reporting discriminatory conduct by BPD supervisors. That complaint has languished without action for more than fifteen (15) months.

68. On or about December 4 - 20, 2024, Plaintiff registered for the BPD Sergeant promotional examination scheduled for December 21, 2024, and requested disability accommodations for PTSD. Plaintiff provided timely and adequate medical documentation from his treating providers, Libby Flavin, LICSW and Kelly Russell, LMHC, supporting his need for accommodations. This documentation was submitted to BPD's Occupational Health Department, Human Resources Division ("HRD"), and Promotional Examination personnel between December 4 and December 20, 2024. (Ex. 3.)

69. Defendant Natasha Gumbs-Levity, as Acting HR Director, referred to required accommodations as "special accommodations" and failed to engage in the required interactive process. Despite providing the Department with timely and adequate documentation, the request for accommodations was disregarded. BPD denied Plaintiff's accommodation request and did not provide a make-up exam, while granting accommodations or make-up opportunities to other candidates.

70. On or about December 27, 2024, Plaintiff filed an appeal with the Civil Service Commission ("CSC") through the HRD portal, challenging the denial of disability accommodations for the promotional examination.

71. On or about June through August 2025, Plaintiff sought resolution of the promotional exam accommodation denial through the Civil Service system. Plaintiff was shuffled between HRD and CSC for months without any substantive review. Deputy General Counsel Caroline De Luca ultimately confirmed on July 21, 2025, that CSC had "no record" of Plaintiff filing an appeal, despite Plaintiff's documentation showing he filed on December 27, 2024. This pattern of institutional obstruction mirrors the pattern Plaintiff experienced when reporting sexual assault. (Ex. 4.)

72. On or about September 24, 2025, Civil Service Commissioner Stein issued an Order in Case No. B2-25-197, requiring Plaintiff to submit documentation regarding his accommodation request.

73. On or about November 14, 2025, through counsel (Ida R. Candreva, Esq.), Plaintiff filed his Response to Commissioner Stein's Order. That appeal remains pending.

74. On or about February 27, 2025, the BPPA, Plaintiff's exclusive bargaining representative, publicly endorsed Mayor Michelle Wu for reelection. News coverage reported that BPPA and its affiliated EMS partners gave Mayor Wu a "ringing endorsement," members had voted "overwhelmingly" to support her, and that it was the first time in more than thirty years that Boston's largest police union had endorsed a Boston mayor for reelection. This endorsement occurred while Plaintiff was actively facing forced involuntary retirement allegedly at Mayor Wu's direction.

**I. Phase VIII: Forced Retirement Campaign and Direct Evidence (July - October 2025)**

75. On or about July 25, 2025, Defendants Gina Edge-O'Leary, Sharon Dottin, and Lisa O'Brien signed an involuntary disability retirement application for Plaintiff, each certifying under the penalties of perjury that the contents were "true, complete and accurate."

76. The application contains seven (7) provably false statements:

(a) States Plaintiff "returned to work" on February 23, 2023, when that is the date he went OUT on FMLA leave;

(b) References attachments that are not actually attached;

(c) Leaves the "Determination of Essential Duties" page completely blank while asserting he cannot perform essential duties;

(d) Answers "No" to questions about existing grievances or legal actions, despite City's knowledge of Plaintiff's pending MCAD charge;

(e) States Plaintiff is not in an accommodated position, despite records showing Plaintiff works in a modified assignment;

(f) Claims Plaintiff cannot perform essential functions with accommodation, despite his eighteen (18)-month performance record and active POST certifications;

(g) Claims inability to perform duties while ignoring that independent licensing authorities in two states have certified Plaintiff fit for police work.

77. On or about August 6, 2025, Plaintiff met with then Lieutenant Richard Osberg at District D-14 regarding his employment status. During that meeting, Plaintiff asked why he was being forced out despite his successful performance and active certifications. Osberg stated that Plaintiff's retirement was "because of what Michelle Wu wanted" and told him "Good luck with whatever you do next." Plaintiff memorialized this statement in writing. (Ex. 10.)

78. On or about August 7, 2025, City submitted the involuntary disability retirement application to the Boston Retirement System.

79. On or about August 14, 2025, Plaintiff sent an email to Occupational Health Deputy Director Gina Edge-O'Leary stating: "For clarity, my injury was sustained in the course of duty and arose directly from sexual assaults, intimidation of a witness under color of law, and related retaliatory and other unlawful acts by Boston Police Department supervisors." (Ex. 12.)

80. On or about August 20, 2025, Occupational Health Director Chanel Bryant-Alexander responded to Plaintiff, copying Lt. Richard Osberg on the reply by directing Plaintiff to "seek legal counsel" and stated that Occupational Health "does not handle employee nor

criminal complaints." The Department never answered whether criminal complaints were filed against the supervisors Plaintiff reported. Osberg was copied on this correspondence. (Ex. 12.)

81. On or about September 11, 2025, Deputy Superintendent James W. Miller issued a Written Reprimand to Plaintiff for IAD Case 2022-0495, sustaining Rule 102 § 9 (Respectful Treatment, 2 Counts) for Plaintiff's statements to Sgt. Zelvis when confronting him about the sexual assaults. City had already admitted in its MCAD Position Statement that "there was an error made by IAD in recording the complaint" in this very case. (Ex. 1 para. 38.)

82. On or about October 17, 2025, Commissioner Michael Cox sent Plaintiff a letter stating he was "contemplating disciplinary action against you, including but not limited to, discharge" in connection with IAD Case 2022-0505. Another officer received three days' suspension for a recording violation. Plaintiff faces termination.

83. On or about October 24, 2025, Personnel Order 25-377 promoted Osberg to Captain, seventy-nine (79) days after he told Plaintiff the forced retirement was "because of what Michelle Wu wanted."

84. On or about October 30, 2025: Plaintiff submitted a five-page Form 26 to Captain Wayne Lanchester titled "Request for Investigation – Possible Violations of Rules 112, 113, and 204 Following Reports of Sexual Harassment and Discrimination," memorializing Osberg's statement and requesting an internal investigation. (Ex. 10.)

**J. Phase IX: POST Commission Damage and Union Abandonment (November 2025 – Present)**

85. On or about November 2025, Plaintiff discovered that BPD had reported sustained findings from IAD Case 2022-0505 to the POST Commission, and those findings now appear on his permanent certification record. The POST record was updated on or about November 25, 2025. Plaintiff was never notified of this submission before it affected his permanent certification record.

86. The POST record states:

"Conduct Unbecoming - Officer secretly recorded other officers within restricted space of the department 22 separate times over a 10-day period."

"Unreasonable Judgement (12 Counts) - Officer secretly recorded other officers without their knowledge. Officer confirmed he was aware recording another person without their knowledge constituted a felony."

87. Each element of this characterization is false:

(a) **"Secretly recorded":** The recording was not secret. Plaintiff's phone was visible on his desk. Sgt. Tobin observed it recording before seizing it. City admitted this. (Ex. 1 para. 42.) Under *Hyde*, a recording device "in plain sight" is not "secret."

(b) **"Restricted space":** This phrase appears in no BPD rule, no IAD document, and no prior correspondence concerning this matter. There is no "restricted space" designation for the CSRU common area. Other officers routinely used video cameras and cell phones to record in the same space. The phrase was fabricated specifically for the POST submission.

(c) **"Constituted a felony":** Under binding First Circuit precedent, recording government officials performing their duties is constitutionally protected. The IAD

interview obtained Plaintiff's "confirmation" through leading questions while never

informing him of this controlling authority or the *Hyde* "plain sight" exception. The

"felony" characterization is false as a matter of law.

88. The fabrication of "restricted space" is particularly significant. If CSRU was truly a

restricted space for recording, that designation would exist in writing. It does not. If

recording were prohibited in CSRU, other officers who recorded there would have been

disciplined. They were not. The phrase was invented to transform the Plaintiff, the

victim's visible, self-protective documentation into what sounds like criminal espionage,

maximizing reputational damage on a permanent, publicly searchable record.

89. Plaintiff received no notice before BPD reported sustained findings to POST. Plaintiff

received no opportunity to challenge the submission. Plaintiff received no hearing. The

findings appear on Plaintiff's permanent public record before any administrative process

was complete. This violates the due process protections which requires notice and an

opportunity to be heard before a government employee is deprived of a property interest.

90. On or about December 7, 2025, Plaintiff emailed the Office of Administrative Hearings,

with copies to BPD Legal Advisors Omar Bennani and David Fredette, as well as Joseph

Gillespie, challenging the accuracy of the POST submission and the "felony"

characterization. (Ex. 11.) Plaintiff asked when and by whom findings were reported to

POST, why they were reported before his hearing, and whether he had any right to

respond before his certification was affected. Plaintiff stated: "I was recording workplace

conditions to document what was still happening after my reports (verbally and in

writing) were ignored. I believe I am allowed to say no to sexual assault and to document

it when my reports result in retaliation rather than investigation." As of the filing of this

Complaint, no substantive response has been received.

91. On or about November 3, 2025: BPPA provided Attorney Kenneth Anderson sent Plaintiff an email stating that Plaintiff's recording constituted "the felony crime of wiretapping" and "multiple felonies," and that "[t]he hearing officer is hand-picked by the Commissioner" and "it is extremely rare" for them to rule against BPD. When Plaintiff raised discrimination concerns, Anderson characterized them as "dramatic." Anderson concluded by telling Plaintiff "Best of luck." This is not legal representation; it is abandonment dressed in professional language.

92. Attorney Anderson's characterization of Plaintiff's documentation as "multiple felonies" is contradicted by binding First Circuit precedent holding that recording government officials performing their duties is constitutionally protected, and by Massachusetts precedent holding that a recording device "in plain sight" is not "secret" under Mass. Gen. Laws ch. 272, § 99. A union attorney advising an officer that documenting supervisor misconduct constitutes "multiple felonies," while simultaneously describing the hearing process as structurally rigged in the Department's favor, does not provide meaningful representation to that officer. It provides cover for the Department's predetermined outcome.

93. After receiving Anderson's email, Plaintiff reasonably concluded that BPPA's political alignment with the Wu administration, public endorsement of Mayor Wu, and acceptance of BPD's false "felony" narrative had created an insurmountable conflict of interest. The union that should have defended Plaintiff was instead providing a veneer of due process to proceedings designed to expel Plaintiff. In practice, the union stopped defending Plaintiff's interests and left him effectively without representation in disciplinary proceedings and before the POST Commission.

94. Plaintiff does not assert claims against BPPA in this action but alleges these facts to explain why he lacked effective representation in internal BPD processes and to show that Defendants' actions were able to proceed unchecked because the union that should have defended him was structurally conflicted and unwilling to do so. Plaintiff reserves the right to amend this complaint to add claims against BPPA should discovery reveal evidence warranting such claims, including but not limited to claims arising from BPPA's endorsement of Mayor Wu while simultaneously representing Plaintiff in proceedings allegedly directed by the Mayor, and Attorney Anderson's abandonment of Plaintiff's defense while characterizing constitutionally protected activity as "multiple felonies."

95. The Asymmetry of Institutional Response: Plaintiff's POST complaint against BPD supervisors (Complaint #8986) has languished without action for more than fifteen (15) months. BPD's submission against Plaintiff was processed and made part of his permanent record within days. When Plaintiff reported sexual assault, the machinery stalled. When supervisors sought to retaliate, the machinery accelerated. The officer who reported misconduct is targeted; the supervisors whose conduct he reported are effectively shielded. This is not bureaucratic delay, it is institutional design.

**K. POST Commission Conflicts of Interest**

96. The POST Commission that published the false "felony" characterization on Plaintiff's permanent record includes two Commissioners with disqualifying conflicts of interest in Plaintiff's case.

97. **Commissioner Lawrence Calderone Conflict:** Commissioner Lawrence Calderone is the President of BPPA and Chair of the Massachusetts Law Enforcement Policy Group. Calderone sits on the POST Commission pursuant to Mass. Gen. Laws ch. 6E, § 2. As BPPA President, Calderone led the union that publicly endorsed Mayor Michelle Wu in

February 2025, the same Mayor whom Lt. Osberg identified as directing Plaintiff's forced

retirement. As BPPA President, Calderone oversees the union whose attorney told

Plaintiff his case involved "multiple felonies" and wished him "best of luck" rather than

mounting a defense. Commissioner Calderone has an inherent conflict participating in

any POST matter involving a BPPA-represented officer whose termination his union

facilitated and whose case his union abandoned.

98. **Commissioner Eddy Chrispin Conflict - False Statement:** Commissioner Eddy

Chrispin, a BPD Sergeant Detective, was appointed to POST as the Massachusetts

Association of Minority Law Enforcement Officers ("MAMLEO") representative. On

June 12, 2024, Commissioner Chrispin served on the interview panel for the Academy

Instructor position (CM 24-30) that Plaintiff applied for, alongside Dennis Cogavin.

During this interview, Plaintiff discussed how he would teach Rule 114 (Sexual

Harassment, Discrimination, Harassment, and Retaliation Policy) to academy recruits,

explaining his perspective as an officer who had experienced workplace harassment.

Commissioner Chrispin responded that he teaches that policy himself. This was a

substantive professional discussion about policy instruction based on Plaintiff's lived

experience. Plaintiff has the calendar invitation documenting this interview. Despite this

substantive professional interaction, Commissioner Chrispin stated in an October 31,

2025, email: "I am sure that we have never had any conversations regarding anything

other than to greet each other in passing." This statement is demonstrably false. A formal

job interview discussing harassment policy instruction is not "greeting in passing." When

convenient, people forget the Plaintiff, an openly gay officer exists.

99. **Commissioner Chrispin Conflict - Hate Crime Suppression:** Commissioner Chrispin

serves as Sergeant Detective in charge of BPD's Civil Rights Unit. On or about February

26, 2025, Commissioner Chrispin emailed Plaintiff instructing him to uncheck the

"suspected hate crime" box on an incident report, stating: "Please edit your report to uncheck the 'suspected hate crime' box... This report will be considered 'sextortion' and not a hate/bias crime." On or about April 26, 2025, Detective LaKenya Webster of the Civil Rights Unit sent a similar instruction regarding incident #252031949: "can you please uncheck the Hate Crime Box." Plaintiff is an openly gay officer who filed sexual assault and sexual orientation discrimination complaints. The systematic declassification of hate crimes by the Civil Rights Unit, led by a POST Commissioner, raises serious concerns about the impartial handling of cases involving LGBTQ+ victims and officers. When hate crimes are reclassified as something else, hate disappears from the statistics. When hate disappears from the statistics, there is no problem to solve.

100.     **Commissioner Chrispin Conflict - Own Retaliation Lawsuit:** Commissioner Chrispin is currently suing Commissioner Michael Cox in federal court (*Chrispin v. Cox*, D. Mass., filed April 3, 2025) for First Amendment retaliation and due process violations arising from his demotion after accepting the POST Commissioner appointment. Commissioner Chrispin alleges that Commissioner Cox demoted him without notice or hearing in violation of due process, the same due process violation Plaintiff alleges regarding his POST record publication. Despite experiencing retaliation from the same Commissioner and bringing nearly identical legal claims, Commissioner Chrispin declined to intervene when Plaintiff contacted him and instead made a demonstrably false statement about their prior interactions. Shared oppression does not guarantee solidarity.

101.     **Closed Referral Loop:** When Plaintiff contacted Commissioner Chrispin on October 30, 2025, regarding his POST-certified status and the retaliation he was facing, Commissioner Chrispin responded that he "cannot and do not take on individual issues regarding the workplace" and referred Plaintiff to POST Executive Director Enrique Zuniga. Commissioner Chrispin also referred Plaintiff to "the Mayor's Office of

LGBTQIA+ Advancement, Human Rights Commission and our own Superintendent
Dahill, who is the Department's LGBTQ liaison." Superintendent Dahill had already been
copied on Plaintiff's September 24, 2025, email requesting a hearing regarding IAD Case
2022-0495. Dahill never responded or reached out to Plaintiff. The Mayor's Office of
LGBTQIA2S+ Advancement ("MOLA") had previously told Plaintiff only to "stay
connected via newsletter." This referral pattern creates a closed loop where no entity
provides actual intervention, only referrals to other entities that also decline to act.

102.    Plaintiff does not assert claims against the POST Commission or individual
Commissioners in this action, but alleges these facts to show: (1) why Plaintiff's POST
record was handled by a body with disqualifying conflicts; (2) why internal remedies
were futile; (3) why the false "felony" characterization was published without adequate
safeguards; and (4) how the same political alignment that drove retaliation at BPD
extends to the body responsible for officer certification. Plaintiff reserves the right to
amend this complaint to add POST-related claims should discovery warrant.

103.    **Structural Exclusion of LGBTQ+ Representation:** The POST Commission statute
mandates specific representation and expertise requirements designed to prevent bias and
ensure accountability. Under Mass. Gen. Laws ch. 6E, § 2(b), the Commission must
include: (1) representation for minority law enforcement officers through MAMLEO; (2)
representation for labor unions through the Massachusetts Law Enforcement Policy
Group; (3) an attorney appointed from the Massachusetts Bar Association's civil rights
and social justice section; (4) racial and gender diversity reflecting the Commonwealth's
population; and (5) commissioners with "experience or expertise in... civil rights law, the
criminal justice system, [and] social science fields related to race or bias." Despite these
detailed protections, the statute contains no requirement for LGBTQ+ representation, no
safeguard against anti-LGBTQ+ bias among commissioners, and no requirement for

expertise in sexual orientation discrimination, even though *Bostock v. Clayton County*, 590 U.S. 644 (2020), established that sexual orientation discrimination constitutes sex discrimination under federal law. When an openly gay officer's POST record is adjudicated by a commission with no LGBTQ+ representation or expertise, and when that officer's sexual orientation can be challenged with questions like "How do we know you are gay?" (Sgt. Det. Bagas, July 8, 2024), the structural bias is clear: LGBTQ+ officers' certification decisions are made by a body that neither includes nor understands them. This exclusion is not accidental. It enables the individual discrimination documented throughout this Complaint.

**L. Pattern Evidence: City's Custom of Retaliating Against Whistleblowers**

104.    Plaintiff is not the first officer BPD has forced out after reporting misconduct. City has a persistent pattern of retaliating against employees who report discrimination or misconduct by supervisors. This pattern is relevant to establishing City's custom, practice, and deliberate indifference to known risks of constitutional violations. The pattern also demonstrates that what happened to Plaintiff was not aberrational, it was institutional.

105.    **Beth Donovan (2020–2024):** The first female Deputy Superintendent in BPD history reported that a male Lieutenant sexually assaulted her. She was demoted eight ranks and forced into retirement. City paid $2.4 million to settle her claims in January 2024. She reported sexual assault; she was destroyed. The perpetrator was protected.

106.    **Donna Gavin (2018–2021):** A Lieutenant Detective who led BPD's Human Trafficking unit reported gender discrimination. She faced a fabricated 45-page IAD complaint filed after she filed her MCAD complaint. A jury awarded her $2 million plus $1.3 million in attorney's fees ($3.3 million total). She reported discrimination; IAD was weaponized against her.

107.    **Enxhi Qirici (2019–2025):** A probationary officer reported a hostile work environment. She was fired three weeks after filing her MCAD complaint. A jury awarded her $1 million on November 18, 2025, confirming the pattern is ongoing. See Qirici v. City of Boston, No. 2184CV01457 (Suffolk Super. Ct.). She reported a hostile environment; she was terminated within weeks.

108.    **Brendan Gaughan (2023–Present):** A Captain with 34 years of service was asked to falsify IAD findings to protect a dishonest officer. When he refused, he was bypassed for promotion despite ranking #1. His lawsuit names BPD Legal Advisor David Fredette and Superintendent Sharon Dottin as defendants. Dottin is directly implicated in Plaintiff's case, she signed the involuntary retirement application containing seven provably false statements under the pains and penalties of perjury. He refused to falsify findings; his career was sabotaged by officials who also participated in Plaintiff's forced retirement.

109.    **Marwa Khudaynazar (2024–Present):** A City employee in the Mayor's office reported harassment by a Wu administration appointee. She was fired five days after making the report. She reported harassment in the Mayor's own office; she was terminated within days.

110.    *Doe v. City of Boston* (1995–2025): In July 2025, the First Circuit vacated the dismissal of claims against BPD officers and City arising from BPD's decades-long cover-up of child sexual abuse by Officer Patrick Rose. The court held that plaintiffs plausibly alleged state-created danger claims where BPD officers interviewed a child victim in front of his abuser, instructed the Department of Children and Families ("DCF") not to reinterview the victim, and approved vacating a restraining order—acts that "emboldened" the abuser to "escalate" his abuse. BPPA provided Rose with legal representation that facilitated his return to duty; Rose later served as BPPA President from

2014 to 2018. The First Circuit's decision confirms that BPD's pattern of protecting

abusers while silencing victims is not merely negligent, it is actionable. The parallels to

Plaintiff's case are striking. In both, the institution protected the perpetrator, weaponized

its processes against the victim, and allowed abuse to continue unchecked.

111.    These cases, representing more than $7.2 million in documented liability—with

additional claims pending and the First Circuit reviving Doe—show a consistent pattern:

an employee or citizen reports misconduct; IAD, HR, or the chain of command are

weaponized against the reporting party; the perpetrator is protected; and City eventually

faces substantial liability. City has paid millions to settle these claims, yet the pattern

continues unchanged. Taxpayers fund the settlements. Perpetrators keep their pensions.

Victims are destroyed. This is not negligence, it is policy.

**M. City's Failure to Protect LGBTQ+ Officers**

112.    Public safety agencies have acknowledged an elevated threat environment for

LGBTQ+ communities. Despite this, City has refused to treat anti-gay misconduct against

the Plaintiff, an openly gay officer as a serious civil rights issue. The Department has an

LGBTQ+ liaison. The Mayor has an LGBTQIA2S+ office. Neither has lifted a finger to

protect the Plaintiff, an openly gay officer facing sexual assault and retaliation. The

existence of these offices is not evidence of commitment to LGBTQ+ rights, it is

evidence of institutional hypocrisy.

113.    On or about August–September 2025, Plaintiff contacted MOLA, identifying himself

as an openly gay officer facing sexual harassment and retaliation. MOLA refused to

engage, advising Plaintiff only to "stay connected via newsletter." City's own

LGBTQIA2S+ office thus declined to assist an openly gay officer challenging

misconduct. A newsletter is not protection. A newsletter is a press release. The message is

clear: LGBTQ+ officers are welcome as photo opportunities, not as people deserving of

dignity and safety. The structural exclusion extends to the POST Commission itself.

Under Mass. Gen. Laws ch. 6E, § 2, the Commission must include representation for

minority law enforcement officers and labor unions and must ensure racial and gender

diversity. However, the statute contains no requirement for LGBTQ+ representation, no

safeguard against anti-LGBTQ+ bias among commissioners, and no expertise

requirement in sexual orientation discrimination, despite Bostock establishing that sexual

orientation discrimination IS sex discrimination. The body with power to destroy an

officer's career by publishing false "felony" characterizations includes no one required to

understand or represent LGBTQ+ officers. When Sgt. Det. Bagas can ask "How do we

know you are gay?" during an IAD interview, and when POST Commissioner Chrispin

can lie about substantive professional interactions with Plaintiff, an openly gay officers

(his false "greeting in passing" statement), the message is unmistakable: LGBTQ+

officers exist at the sufferance of heterosexual decision-makers who face no

accountability for bias. The Commonwealth requires expertise in "race or bias" but not

sexual orientation—as if discrimination against gay officers is not a form of bias worth

addressing.

**N. Pending Public Records Requests**

114.    On or about November 15, 2025, Plaintiff submitted Public Records Request No.

B003319-111525 to BPD seeking documents related to IAD Cases 2022-0495 and

2022-0505, including BPD policies governing recording in departmental spaces and any

documents reflecting the basis for the "restricted space" characterization.

115.    BPD failed to respond within the ten-business-day deadline required under Mass.

Gen. Laws ch. 66, § 10(b). On or about November 29, 2025, Plaintiff filed an appeal with

the Supervisor of Records at the Secretary of the Commonwealth's Office. That appeal

(Appeal of Public Records Request B003319-111525) remains pending.

116.    On or about December 9, 2025, Plaintiff submitted Public Records Request No.

25-350 to the POST Commission seeking documents related to BPD's submission to

POST concerning IAD Cases 2022-0505 and 2022-0495, including policies governing

publication of sustained findings and the identity of the drafter(s) of the POST

submission. The POST Commission acknowledged receipt on December 9, 2025, and

stated the request is "under review."

117.    On or about December 11, 2025, Plaintiff submitted Public Records Request No.

B003578-121125 to BPD seeking Giglio/Brady disclosure records, identification

procedure documentation, internal review records, and disciplinary history for Officers

Michael O'Dwyer and James Higgins—material witnesses in IAD Case 2022-0505 whose

statements were used to characterize Plaintiff as dangerous. (Ex. 9.) The request

specifically seeks records of their participation in a Roxbury shooting investigation

(Kelvin Thames) where the identified individual was later cleared or charges were

dismissed, as well as documentation from *Commonwealth v. K.T.*, where O'Dwyer,

Higgins, and six other BPD officers misidentified a suspect. Response deadline:

December 26, 2025.

118.    Plaintiff anticipates these public records requests will reveal: (a) that no written BPD

policy designates CSRU as a "restricted space" for recording; (b) that the "restricted

space" and "felony" language was fabricated specifically for the POST submission; (c)

the identity of the individual(s) who drafted and approved the defamatory POST

submission; and (d) evidence of other officers recording in CSRU without discipline,

proving selective enforcement.

**O. Ongoing Harm and Irreparable Injury**

119.    For more than a year, Defendants have refused to return Plaintiff's firearm, radio, and

equipment; refused to schedule firearms requalification; maintained disciplinary findings

rooted in an IAD case City admits was in error; and pursued involuntary retirement based

on seven (7) provably false statements. This is not legitimate personnel management, it is

a coordinated campaign to force out the Plaintiff, an openly gay officer who reported

sexual assault before he reaches his twenty-year pension.

120.    If this course is not halted, Plaintiff will lose his nineteen-year career and his pension

one year before his twenty-year milestone, and his law-enforcement career will be

permanently damaged. The timing is not coincidental. BPD waited until Plaintiff was

close enough to his pension that forcing him out would maximize the punishment, yet far

enough that they could claim they were not targeting his retirement benefits.

121.    Plaintiff has a protected property interest in his POST certification and his continued

employment. The Massachusetts Declaration of Rights, arts. X and XII, requires notice

and a meaningful opportunity to be heard before the government deprives a person of

such interests.

**P. Lisa O'Brien's Pattern of False Sworn Statements**

122.    On or about August 29, 2023, Lisa O'Brien, Chief of the Bureau of Administration

and Technology, signed City's MCAD Position Statement under the pains and penalties of

perjury. (Ex. 1.) The Position Statement claims the Department had 'legitimate,

non-discriminatory reasons' for its actions and concludes that 'neither Sgt. Zelvis nor Lt.

Ciccolo engaged in conduct that was sexually suggestive, motivated by Officer Coleman's

sexual orientation, motivated by retaliation, or otherwise inappropriate.'

123.    Ms. O'Brien's affirmation states the Position Statement 'was prepared with the

assistance and advice of counsel and employees of City of Boston whose advise and

information I have relied.' The detailed denials of wrongdoing by Lt. Ciccolo, Sgt. Zelvis,

and Sgt. Tobin contained in the Position Statement could only have been provided by

those individuals themselves. Ms. O'Brien necessarily relied on self-serving statements

from the very supervisors accused of sexual assault, harassment, and retaliation, parties

with obvious motive to lie. None of these accused supervisors signed the Position

Statement under oath themselves.

124.    Ms. O'Brien's affirmation includes extensive qualifications revealing doubt about the

accuracy of what she was told: the Position Statement is 'subject to inadvertent or

undisclosed errors'; 'based on and therefore necessarily limited by records and

information still in existence'; 'presently recollected'; 'thus far discovered'; and she

'reserves the right to make any changes in the position statement if it appears at any time

that omissions or errors have been made herein or that more accurate information is

available.' These hedges suggest uncertainty about the reliability of information provided

by the accused employees, yet rather than investigate further before signing under perjury,

Ms. O'Brien chose institutional protection over truth.

125.    Less than two years later, on July 25, 2025, the same Lisa O'Brien signed the

involuntary retirement application under perjury, an application containing seven

provably false statements. (Ex. 8.) Ms. O'Brien thus signed two sworn documents: one

claiming City had 'legitimate, non-discriminatory reasons' for its treatment of Plaintiff,

and another seeking to force him out of employment based on demonstrably false

information.

126.    City has since judicially admitted that 'there was an error made by IAD in recording

the complaint made by Sgt. Zelvis.' (Ex. 1 para. 38.) This admission undermines the

factual foundation of the Position Statement Ms. O'Brien signed under oath. Additionally,

Lt. Osberg's statement that Plaintiff's forced retirement was 'because of what Michelle Wu

wanted', not incapacity or legitimate employment reasons, directly contradicts Ms.

O'Brien's sworn claim of 'legitimate, non-discriminatory reasons.'

127.    When the same official makes binding statements under oath that are later

contradicted by City's own admissions and witness statements, her credibility, and the

Position Statement's reliability, is severely compromised. This pattern of hedged, false

sworn statements goes directly to City's credibility and demonstrates deliberate

indifference to the truth in processing claims against LGBTQ+ officers who report sexual

assault.

## V. CLAIMS FOR RELIEF

### COUNT I

### SEXUAL HARASSMENT
Mass. Gen. Laws ch. 151B, § 4(1)
Against Cityof Boston/ Boston Police Department and Defendant Sgt. Zelvis

128.    Plaintiff realleges and incorporates paragraphs 1 through 127 as though fully set forth

herein.

129.    Defendant Sgt. Paul Zelvis subjected Plaintiff to unwelcome sexual conduct,

including repeated physical invasions of his personal space and conduct involving his

genitals in close proximity to Plaintiff's face and body.

130.    This conduct was severe and offensive and affected the terms and conditions of

Plaintiff's employment, constituting sexual harassment under Mass. Gen. Laws ch. 151B.

131.    Plaintiff reported the conduct through Form 26. Rather than investigate and protect

him, City opened an IAD case against Plaintiff, punishing the Plaintiff/victim for

speaking.

132.    City and BPD are vicariously liable for the conduct of Sgt. Zelvis under principles of

respondeat superior and Mass. Gen. Laws ch. 151B. As a direct and proximate result,

Plaintiff suffered emotional distress, PTSD, lost wages, and other damages.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT II

### HOSTILE WORK ENVIRONMENT AND SEXUAL ORIENTATION DISCRIMINATION
Mass. Gen. Laws ch. 151B, § 4(1)
Against City of Boston, Boston Police Department and all Individual Defendants

133.    Plaintiff realleges and incorporates paragraphs 1 through 132 as though fully set forth

herein.

134.    Plaintiff is an openly gay man and a member of a protected class under Mass. Gen.

Laws ch. 151B, § 4(1).

135.    Plantiff was subjected to unwelcome conduct based on his sexual orientation,

including: hostile and demeaning language by Ciccolo (calling him "disgusting" and

"gross"—words that carry unmistakable anti-LGBTQ+ connotations when directed at an

openly gay person); sexual harassment and assault by Sgt. Zelvis; seizure of his phone

while other officers were not similarly treated; discriminatory questioning by Bagas

("How do we know you are gay?"); and differential treatment in equipment, firearms

requalification, and assignments.

136.    This conduct was severe or pervasive enough to create a hostile and abusive work
        environment and to alter the conditions of Plaintiff's employment.

137.    Individual supervisory Defendants participated in or aided and abetted this
        discrimination under Mass. Gen. Laws ch. 151B, § 4(5). Specifically, Defendants Miller,
        Osberg, Tobin, Ciccolo, and Bagas aided and abetted City's discrimination by sustaining
        false charges, seizing evidence, conducting discriminatory questioning, and failing to
        report corruption.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT III

### RETALIATION
Mass. Gen. Laws ch. 151B, § 4(4)
Against City of Boston, Boston Police Department, and all Individual Defendants

138.    Plaintiff realleges and incorporates paragraphs 1 through 137 as though fully set forth
        herein.

139.    Plaintiff engaged in protected activity, including reporting sexual harassment via
        Form 26; reporting discriminatory conduct through HR complaints; filing an MCAD
        charge; requesting disability accommodations; recording harassment and workplace
        conditions; and filing POST Commission Complaint #8986.

140.    In response to his protected activity, Defendants retaliated against Plaintiff by:
        initiating IAD cases against him; seizing his phone; escorting him from the building,
        including by Sgt. Zelvis, the very supervisor he had accused of sexual assaults;
        conducting discriminatory IAD interviews; denying accommodations; sustaining charges

despite admitted IAD error; withholding equipment and requalification; initiating

involuntary retirement based on false statements; threatening discharge; and reporting

sustained findings to POST without notice or hearing.

141.    Osberg's statement that the forced retirement was "because of what Michelle Wu

wanted" is direct evidence that these adverse actions were motivated by retaliation, not by

any legitimate concern about Plaintiff's job performance or fitness for duty. (Ex. 10.)

142.    The characterization of Plaintiff's self-preservation recording as a "felony," and its

publication on Plaintiff's POST certification record, constitute adverse employment

actions taken in retaliation for Plaintiff's protected activity. The Department did not

publish "felony" characterizations for other officers who recorded, only for the Plaintiff,

the gay officer who reported sexual assault.

143.    All claims under Mass. Gen. Laws ch. 151B are based on unlawful practices

occurring on or after April 2022 and/or are part of a continuing pattern.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT IV

### DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE
Mass. Gen. Laws ch. 151B, § 4(16)
Against City of Boston, Boston Police Department, and Defendants
Gumbs-Levity, Edge-O'Leary, Dottin, and O'Brien

144.    Plaintiff realleges and incorporates paragraphs 1 through 143 as though fully set forth

herein.

145.    Plaintiff is a qualified individual with a disability (PTSD) within the meaning of

Mass. Gen. Laws ch. 151B, § 1(17). Plaintiff can perform the essential functions of his

job with or without reasonable accommodations, as shown by his eighteen (18) months of

successful performance and active POST certifications in two states.

146.    Plaintiff requested reasonable accommodations for the December 21, 2024 Sergeant

promotional examination, supported by timely medical documentation from Libby Flavin,

LICSW and Kelly Russell, LMHC. Defendant Gumbs-Levity and City failed to engage in

a timely, good-faith interactive process and denied the requested accommodations, while

other candidates received make-up exams or flexibility.

147.    City used disability as a pretext to seek involuntary retirement through an application

containing seven (7) provably false statements. Defendants Edge-O'Leary, Dottin, and

O'Brien each signed this application under the pains penalties of perjury, certifying false

information as true. They claimed Plaintiff could not perform essential duties while

ignoring that two independent state licensing authorities have certified him fit for police

work.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT V

### WHISTLEBLOWER RETALIATION
Mass. Gen. Laws ch. 149, § 185
Against City of Boston and Boston Police Department

148.    Plaintiff realleges and incorporates paragraphs 1 through 147 as though fully set forth

herein.

149.    Plaintiff disclosed and objected to violations of law and misuse of governmental

authority, including: sexual assault by a superior officer (Mass. Gen. Laws ch. 265, §

13H); discriminatory conduct based on sexual orientation (Mass. Gen. Laws ch. 151B);

unlawful seizure of his phone and interference with evidence (Mass. Gen. Laws ch. 268, §

13B); and political interference in personnel decisions.

150.    These disclosures and objections were made to supervisors and to public bodies,

including MCAD and the POST Commission, within the meaning of Mass. Gen. Laws

ch. 149, § 185(a)(1)(3).

151.    City and BPD retaliated against Plaintiff for these disclosures by initiating and

sustaining IAD charges, denying accommodations, withholding equipment, initiating

involuntary retirement proceedings, threatening discharge, and reporting sustained

findings to POST without hearing.

152.    Plaintiff brings this claim based on retaliatory actions occurring within two years prior

to the filing of this action; earlier retaliation is alleged as background and to show pattern

and intent. Under Mass. Gen. Laws ch. 149, § 185(d), Plaintiff is entitled to TREBLE

DAMAGES, reinstatement, back pay, benefits, and attorney's fees.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

### COUNT VI

### MASSACHUSETTS CIVIL RIGHTS ACT
Mass. Gen. Laws ch. 12, §§ 11H, 11I
Against All Defendants

153.    Plaintiff realleges and incorporates paragraphs 1 through 152 as though fully set forth herein.

154.    Defendants, by threats, intimidation, and coercion, interfered with or attempted to interfere with Plaintiff's exercise and enjoyment of rights secured by the Constitution and laws of the Commonwealth of Massachusetts, including:

(a) The right to be free from discrimination and retaliation in employment (Mass. Gen. Laws ch. 151B);

(b) The right to report violations of law without retaliation (Mass. Gen. Laws ch. 149, § 185);

(c) The right to petition the government for redress of grievances (Mass. Declaration of Rights art. XIX);

(d) The right to due process before deprivation of property interests (Mass. Declaration of Rights arts. X, XII).

155.    The threats, intimidation, and coercion include: opening IAD cases against Plaintiff within hours of his protected reports; seizing his recording device; characterizing his recording as a "felony" in official submissions and communications when that characterization is false under binding precedent; a false criminal accusation designed to coerce Plaintiff into abandoning his complaints and to destroy his credibility; threatening termination; reporting sustained findings to POST without hearing, thereby damaging Plaintiff's permanent licensing record as punishment for speaking; pursuing involuntary retirement based on false statements; and creating an environment in which Plaintiff reasonably fears further retaliation for every word he speaks and every document he files.

156.    Plaintiff has suffered actual damages because of these violations and is entitled to compensatory damages, costs, and attorney's fees under Mass. Gen. Laws ch. 12, § 11I.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his behalf, together with interest, costs and attorney fees and any other relief that this Honorable Court deems just and reasonable.

## COUNT VII

### VIOLATION OF MASSACHUSETTS DECLARATION OF RIGHTS

(Due Process - Property Interests in Employment and POST Certification)
Mass. Declaration of Rights arts. X, XII
Against City of Boston and Boston Police Department

157.    Plaintiff realleges and incorporates paragraphs 1 through 156 as though fully set forth herein.

158.    Plaintiff has two protected property interests at stake:

(a) his continued employment, wages, and pension as a civil service employee with nineteen years of continuous service; and

(b) his POST certification, which is his license to work as a police officer.

159.    Articles X and XII of the Massachusetts Declaration of Rights require that before the government deprives a person of a property interest, the person must receive notice and a meaningful opportunity to be heard.

160.    Defendants have deprived or are seeking to deprive Plaintiff of these property interests without due process: BPD reported sustained findings to POST without notifying Plaintiff; POST published those findings on his permanent record; Plaintiff has had no hearing; the record contains a false "felony" characterization and fabricated "restricted space" language; and decision-makers have pre-judged the outcome, as evidenced by Osberg's statement that it was "because of what Michelle Wu wanted."

161.    Plaintiff's ability to obtain a meaningful opportunity to be heard was further undermined by the fact that his exclusive bargaining representative, BPPA, had become politically aligned with the very municipal officials directing retaliation against him. The union that should have defended him endorsed the Mayor who wanted him gone. As a result, BPPA declined to challenge City's actions and instead discouraged Plaintiff from pursuing his civil-rights claims, effectively leaving him without representation in a process where officers are expected to appear through union-provided counsel.

162.    Plaintiff seeks a declaration that the current framework, as applied, violates due process, and an injunction requiring Defendants to correct the POST record and provide constitutionally adequate process.

### COUNT VIII

### INJUNCTIVE AND DECLARATORY RELIEF
Against City of Boston, Boston Police Department, Wu, and Cox in
Official Capacities

163.    Plaintiff realleges and incorporates paragraphs 1 through 162 as though fully set forth herein.

164.    **IRREPARABLE HARM:** Plaintiff faces imminent irreparable harm if Defendants continue the forced retirement, the use of erroneous IAD findings, and POST reporting based on those findings, including permanent loss of his career, loss of pension one year before his twenty-year milestone, and lasting damage to his ability to work in law enforcement.

165.    **LIKELIHOOD OF SUCCESS:** Plaintiff has a substantial likelihood of success based on: direct evidence of retaliatory motive (Osberg's statement, Ex. 10); City's binding admissions of IAD error and phone seizure (Ex. 1); seven (7) provably

documented false statements in the retirement application (Ex. 8); active POST

certifications in two states; eighteen (18) months of successful performance; pattern

evidence from whistleblower cases totaling more than $7.2 million in liability; POST

reporting before hearing (Ex. 2); the false "felony" characterization of a visible recording,

a characterization contradicted by binding First Circuit and Massachusetts precedent; and

BPD Legal's failure to respond to Plaintiff's direct challenge of the POST characterization

(Ex. 11).

166.    **BALANCE OF HARMS:** City faces only temporary administrative delay. Plaintiff

faces permanent career and licensing consequences one year before his twenty-year

pension milestone. The asymmetry is stark: for City, inconvenience; for Plaintiff,

destruction.

167.    **PUBLIC INTEREST:** The public interest is served by preventing retaliation against

officers who report misconduct, ensuring LGBTQ+ officers are treated lawfully, and

enforcing due process. The public also has an interest in knowing that when their tax

dollars fund settlements for retaliation, $7.2 million and counting, the institutions

responsible will eventually be compelled to change.

168.    **ASYMMETRY OF RESOURCES AND ACCESS:** Plaintiff respectfully asks this

Court to consider the profound asymmetry of resources between the parties. Defendants

include City of Boston, the Mayor's office, the Police Commissioner, and a police

department with dedicated legal counsel, public affairs staff, and institutional

relationships with media. Plaintiff, by contrast, is a single individual proceeding pro se

after his union abandoned him, with no media contacts, no public affairs apparatus, and

no institutional allies. Without injunctive relief requiring correction of the POST record,

Defendants' version of events, including the false "felony" characterization and fabricated

"restricted space" language, will become the permanent public record, regardless of

outcome at trial.

169.    **COURT AS SOLE AVENUE FOR JUSTICE:** Plaintiff has exhausted every

internal remedy. Plaintiff reported through the chain of command. No protection. Plaintiff

filed with HR; his complaints were used against him. Plaintiff filed with MCAD. City

admitted error but continued retaliation. Plaintiff contacted his union. The Union

endorsed the Mayor and abandoned him. Plaintiff contacted the Mayor's LGBTQ+ office.

They offered only a newsletter. Plaintiff contacted a POST Commissioner. That

Commissioner lied about knowing him. Every institution designed to provide

accountability has either failed Plaintiff or actively participated in his removal. This Court

is Plaintiff's only remaining avenue for justice.

## COUNT IX

### DEFAMATION

Against Doe Defendant(s), City of Boston, and Boston Police Department

170.    Plaintiff realleges and incorporates paragraphs 1 through 169 as though fully set forth

herein.

171.    Plaintiff acknowledges that Mass. Gen. Laws ch. 258, § 10(c) exempts certain

intentional torts, including defamation, from claims against public employers. This Count

is therefore brought primarily against the Doe Defendant(s) who drafted and approved the

defamatory POST submission. To the extent City contends MTCA bars this claim against

the municipal defendants, Plaintiff notes: (a) the same defamatory conduct supports the

retaliation claims under Mass. Gen. Laws ch. 151B, which are not barred by MTCA; (b)

the same conduct supports the MCRA claim, which provides an independent basis for

damages arising from the coercive false characterization; and (c) Plaintiff reserves all

arguments that MTCA does not apply where the tortious conduct was undertaken in furtherance of an unlawful scheme to retaliate against a whistleblower. The defamation count against individual Doe Defendant(s) is not affected by MTCA.

172.    On or about November 25, 2025, Defendants published statements to the Massachusetts POST Commission that now appear on Plaintiff's permanent, publicly searchable certification record.

173.    These statements include:

(a) That Plaintiff "secretly recorded" other officers, when City has admitted in its MCAD Position Statement that Sgt. Tobin observed the phone recording before seizing it, and when under *Hyde* a recording device "in plain sight" is not "secret;"

(b) That the recording occurred "within restricted space of the department," when no such designation exists in any BPD rule, IAD document, or prior correspondence. This phrase was fabricated specifically for public dissemination;

(c) That Plaintiff "confirmed he was aware recording another person without their knowledge constituted a felony," when binding First Circuit precedent establishes that recording government officials performing their duties is constitutionally protected and cannot be criminalized.

174.    Each of these statements is false. The phone was visible, not secret. The "restricted space" designation was invented. The "felony" characterization is contradicted by controlling law.

175.    The statements constitute defamation per se because they accuse Plaintiff of criminal conduct, specifically commission of a felony. Under Massachusetts law, accusations of criminal conduct are actionable without proof of special damages.

176.  Defendants published these statements with actual malice - knowledge of falsity or reckless disregard for truth. The malice is evidenced by:

(a) The fabrication of "restricted space" language that appears in no prior document;

(b) City's own admission that the underlying IAD case contained "error";

(c) Lt. Osberg's statement that Plaintiff's forced retirement was "because of what Michelle Wu wanted";

(d) The failure to provide Plaintiff notice or opportunity to respond before publication;

(e) The inflammatory framing of victim self-protection as criminal espionage;

(f) The availability of binding legal precedent contradicting the "felony" characterization, which Defendants either knew or recklessly disregarded.

177.  The publication was made to a state licensing authority and is publicly searchable, ensuring maximum dissemination and permanent career damage. The defamatory statements affect Plaintiff's ability to work in law enforcement in any state with reciprocity agreements, including California, where Plaintiff holds an active POST certification through October 6, 2026.

178.  As a direct and proximate result of Defendants' defamation, Plaintiff has suffered and continues to suffer damage to his professional reputation, harm to his POST certifications in Massachusetts and California, diminished employment prospects in law enforcement, and severe emotional distress.

179.  Plaintiff seeks compensatory damages, punitive damages for the malicious and willful nature of the defamation, and injunctive relief requiring correction of the POST record.

180.  Plaintiff has submitted Public Records Request No. 25-350 to the POST Commission and Public Records Request No. B003319-111525 to BPD seeking documents related to the submission, including the identity of the drafter(s). Upon identification of the

individual(s) who drafted and/or approved the defamatory language, Plaintiff will move

to amend this Complaint to name them as defendants.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT X

### CONVERSION

Against Defendant Tobin

181.    Plaintiff realleges and incorporates paragraphs 1 through 180 as though fully set forth

herein.

182.    On or about December 29, 2022, Defendant Tobin intentionally seized Plaintiff's

department-issued cell phone from Plaintiff's desk without Plaintiff's consent, without a

warrant, without supervisory authorization, and without lawful justification.

183.    While the device was department-issued, the phone contained Plaintiff's personal

recordings documenting workplace conditions, which constituted Plaintiff's personal

property and potential evidence for his MCAD complaint filed the following day.

184.    Tobin exercised unlawful dominion and control over Plaintiff's personal property, the

recordings and data stored on the device, in a manner inconsistent with Plaintiff's

possessory rights. Plaintiff's personal recordings constitute property subject to conversion.

185.    Plaintiff demanded return of the phone and its contents. Tobin refused.

186.    Tobin's seizure was not conducted pursuant to any departmental policy, investigation

protocol, or lawful authority. No inventory was taken. No receipt was provided. The

seizure occurred one day before Plaintiff filed his MCAD complaint, supporting the

inference that the purpose was evidence destruction or witness intimidation rather than

any legitimate departmental interest.

187.    As a direct and proximate result, Plaintiff was deprived of his property and of

evidence he had gathered to document ongoing harassment, causing damages including

loss of evidence, emotional distress, and harm to his legal claims.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.


## COUNT XI

### FOURTH AMENDMENT - UNREASONABLE SEIZURE (42 U.S.C. § 1983)
Against Defendant Tobin

188.    Plaintiff realleges and incorporates paragraphs 1 through 187 as though fully set forth

herein.

189.    Plaintiff had a reasonable expectation of privacy in the personal recordings stored on

the device assigned to him.

190.    Tobin seized the device and its contents without a warrant, without consent, and

without any applicable exception to the warrant requirement.

191.    Tobin acted under color of state law as a Boston Police sergeant.

192.    The seizure violated Plaintiff's rights under the Fourth Amendment to the United

States Constitution to be free from unreasonable searches and seizures.

193.    As a direct and proximate result, Plaintiff suffered deprivation of his constitutional

rights, loss of evidence, emotional distress, and damages to be proven at trial.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT XII

### ASSAULT
Against Defendant Sgt. Zelvis

194.    Plaintiff realleges and incorporates paragraphs 1 through 193 as though fully set forth

herein.

195.    On multiple occasions between approximately October 2022 and December 29, 2022,

Defendant Sgt. Zelvis intentionally placed Plaintiff in reasonable apprehension of

imminent harmful or offensive bodily contact by:

(a) Repeatedly positioning his body and genitals within inches of Plaintiff's face, arm,

and back while Plaintiff was seated at his desk, in a manner that caused Plaintiff to

reasonably apprehend imminent offensive contact;

(b) On or about December 2022, cornering Plaintiff in the supply room, stepping within

inches of Plaintiff's face, breathing directly into Plaintiff's face and mouth, and stating

"I will go with you" in a manner designed to intimidate and isolate Plaintiff;

(c) Physically pushing past two officers to reach Plaintiff, demonstrating intent to make

contact with Plaintiff; and

(d) Engaging in a pattern of deliberate, predatory physical encroachment designed to

create fear of imminent contact and compel submission.

196.    Sgt. Zelvis's conduct was intentional and created in Plaintiff a reasonable

apprehension of imminent harmful or offensive bodily contact.

197.    As a direct and proximate result, Plaintiff suffered severe emotional distress, anxiety,

hypervigilance, and symptoms of PTSD.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT XIII

### FRAUD / INTENTIONAL MISREPRESENTATION
Against Defendants Edge-O'Leary, Dottin, and O'Brien

198.    Plaintiff realleges and incorporates paragraphs 1 through 197 as though fully set forth

herein.

199.    On or about July 25, 2025, Defendants Edge-O'Leary, Dottin, and O'Brien signed and

submitted an involuntary disability retirement application to the Boston Retirement

System concerning Plaintiff. Each Defendant certified under the penalties of perjury that

the contents were "true, complete and accurate."

200.    The application contained the following material misrepresentations of fact:

(a) Falsely stating Plaintiff "returned to work" on February 23, 2023, when that date is

actually when Plaintiff commenced FMLA leave;

(b) Falsely answering "No" to questions regarding existing grievances or legal actions,

despite City's documented knowledge of Plaintiff's pending MCAD charge, filed

December 30, 2022;

(c) Falsely stating Plaintiff "is not in an accommodated position," despite departmental records reflecting Plaintiff's modified duty assignment;

(d) Falsely asserting Plaintiff cannot perform essential job functions with reasonable accommodation, despite Plaintiff's eighteen (18) consecutive months of satisfactory performance with zero disciplinary issues;

(e) Falsely claiming Plaintiff lacks capacity to perform police duties, while omitting that independent licensing authorities in Massachusetts (POST certification valid through July 1, 2028) and California have certified Plaintiff fit for law enforcement service;

(f) Referencing supporting attachments that were not actually attached to the application; and

(g) Leaving the "Determination of Essential Duties" section blank while simultaneously asserting Plaintiff cannot perform essential duties.

201.    Each Defendant knew these statements were false at the time they were made or made them with reckless disregard for their truth or falsity. The certifications were not inadvertent errors. Each Defendant personally signed under oath that the contents were "true, complete and accurate."

202.    Defendants made these misrepresentations with the intent to induce the Boston Retirement System to approve Plaintiff's involuntary retirement, thereby terminating Plaintiff's employment, ending his pension accrual, and destroying his career one year before his twenty-year service milestone.

203.    Plaintiff was a direct, intended victim of Defendants' fraud. The misrepresentations were made about Plaintiff and were designed to cause harm to Plaintiff.

204.    The Boston Retirement System justifiably relied upon these sworn certifications in processing the application for Plaintiff's involuntary separation.

205.    As a direct and proximate result of Defendants' fraud, Plaintiff has suffered and

continues to suffer damages including threatened loss of employment; loss of pension

accrual toward his twenty-year milestone; destruction of his law enforcement career;

emotional distress; anxiety; and reputational harm.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his

behalf, together with interest, costs and attorney fees and any other relief that this Honorable

Court deems just and reasonable.

## COUNT XIV

### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS EMPLOYMENT RELATIONSHIP
Against Defendants Edge-O'Leary, Dottin, and O'Brien

206.    Plaintiff realleges and incorporates paragraphs 1 through 205 as though fully set forth

herein.

207.    Plaintiff had an advantageous employment relationship with City of Boston and the

Boston Police Department, including a property interest in continued employment subject

to civil service protections.

208.    Defendants knew of this relationship.

209.    Defendants intentionally interfered with Plaintiff's employment relationship by

submitting a fraudulent involuntary retirement application containing material

misrepresentations, with the purpose of causing Plaintiff's termination.

210.    Defendants' interference was improper in motive and means, using perjured

documents to circumvent civil service protections and effectuate retaliatory termination.

211.    As a direct and proximate result, Plaintiff has suffered damages as set forth above.

**WHEREFORE**, the Plaintiff demands that this Honorable Court enter judgment on his behalf, together with interest, costs and attorney fees and any other relief that this Honorable Court deems just and reasonable.

## VI. PRESERVATION OF FEDERAL CLAIMS AND AMENDMENT RIGHTS

212.    Plaintiff expressly reserves the right to amend this Complaint to add claims under 42 U.S.C. § 1983, including claims for First Amendment retaliation, Fourth Amendment violations, Equal Protection violations, and municipal liability under *Monell v. Department of Social Services*, should Defendants remove this action to federal court, should federal venue otherwise become appropriate, or should circumstances warrant. The factual allegations set forth herein, including the pattern evidence and the direct evidence of mayoral direction, would support such claims.

213.    Plaintiff expressly reserves the right to amend this Complaint to assert claims against Mayor Wu and Commissioner Cox in their individual capacities should discovery reveal evidence of their direct personal participation in, direction of, or deliberate indifference to the retaliatory conduct alleged herein. Lt. Osberg's statement that Plaintiff's forced retirement was "because of what Michelle Wu wanted" suggests such personal involvement, and Plaintiff anticipates discovery will further illuminate the chain of direction.

214.    Plaintiff expressly reserves the right to amend this Complaint to name the Doe Defendant(s) upon identification through discovery or public records requests.

## VII. NOTICE OF RELATED CASES AND PROCEEDINGS

215.    The following related proceedings are pending:

(a) *Coleman v. Boston Retirement System*, No. 2581CV02968 (Middlesex Super. Ct.) -

HERO Act appeal raising constitutional claims arising from the same pattern of

retaliation. Constitutional questions were removed to Superior Court as the Division

of Administrative Law Appeals ("DALA") lacks jurisdiction over such claims.

(b) Civil Service Commission Appeal, Case No. B2-25-197 - Appeal of denial of

disability accommodations for the December 21, 2024 Sergeant promotional

examination. Plaintiff is represented by separate counsel (Ida R. Candreva, Esq.) in

that proceeding.

(c) DALA Appeal, Case No. CR-25-0530 - HERO Act veteran benefits proceeding

addressing non-constitutional administrative issues. Related to the Superior Court

action in (a).

(d) POST Commission Public Records Request No. 25-350 - Request for documents

related to BPD's submission to POST concerning IAD Cases 2022-0505 and

2022-0495, including policies governing publication of sustained findings.

(e) BPD Public Records Request No. B003319-111525 - Request for documents related

to IAD Cases 2022-0495 and 2022-0505, including any policy designating CSRU as a

"restricted space." Appeal pending with Supervisor of Records.

(f) BPD Public Records Request No. B003578-121125 - Request for Giglio/Brady

disclosure records and identification procedure documentation for Officers O'Dwyer

and Higgins. (Ex. 9.) Response deadline: December 26, 2025.

216. Plaintiff respectfully requests consolidation of related Superior Court matters under

Mass. R. Civ. P. 42(a) and coordination with pending administrative proceedings to the

extent practicable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(A) Declare that Defendants have violated Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 149, § 185, Mass. Gen. Laws ch. 12, §§ 11H, 11I, the Massachusetts Declaration of Rights, and common law prohibitions against defamation;

(B) Issue preliminary and permanent injunctions:

    (i)    Prohibiting Defendants from proceeding with the involuntary retirement application;

    (ii)    Prohibiting Defendants from enforcing any disciplinary actions arising from IAD Cases 2022-0495 and 2022-0505 unless and until Defendants demonstrate by clear and convincing evidence that:

        (a)    the factual predicates for such discipline are accurate and not, as City has admitted, the product of "error";

        (b)    the discipline would have been imposed absent Plaintiff's protected activity, including his reports of sexual assault, his MCAD complaint, and his documentation of workplace conditions; and

        (c)    similarly situated officers who did not engage in protected activity received equivalent discipline for equivalent conduct;

    (iii)    Prohibiting Defendants from terminating or otherwise adversely affecting Plaintiff's employment pending resolution of this action;

    (iv)    Requiring Defendants to return Plaintiff's firearm, radio, and equipment and to schedule firearms requalification;

    (v)    Restoring Plaintiff to full duty or maintaining him on paid administrative leave with full benefits and pension accrual;

(vi)    Requiring Defendants to correct the Massachusetts POST Commission record

to remove the false "felony" characterization and fabricated "restricted space"

language;

(C) Award back pay, front pay, lost benefits, and consequential economic damages;

(D) Award compensatory damages for emotional distress, reputational harm, and other

non-economic harm;

(E) Award TREBLE DAMAGES under Mass. Gen. Laws ch. 149, § 185;

(F) Award punitive damages against Individual Defendants for the malicious and willful

nature of their conduct, including the fabrication and publication of defamatory

statements;

(G) Award reasonable attorney's fees and costs under Mass. Gen. Laws ch. 151B, § 9,

Mass. Gen. Laws ch. 149, § 185(d), and Mass. Gen. Laws ch. 12, § 11I;

(H) Award pre- and post-judgment interest at the statutory rate;

(I) Order consolidation with Case No. 2581CV02968;

(J) Order Defendants to identify the individual(s) who drafted and/or approved the POST

Commission submission containing the defamatory characterizations; and

(K) Grant such other and further relief as the Court deems just and proper.


## IX. JURY DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES.**


Respectfully submitted,
/s/ RORY M. COLEMAN
Plaintiff Pro Se
Dated: Tuesday, December 16, 2025

## EXHIBIT INDEX

The following exhibits are attached hereto and incorporated by reference:

## EXHIBIT 1

City of Boston's MCAD Position Statement (Case No. 22BEM03412), including all attachments. Key admissions:

- Paragraph 38: "[T]here was an error made by IAD in recording the complaint made by Sgt. Zelvis."
- Paragraph 42: "Sgt. Tobin found Officer Coleman's phone on his desk, recording, and confiscated it."
- Attachment W: Sgt. Det. Cazeau's Form 26 (describing phone as "department issued" and visible on desk)

## EXHIBIT 2

Massachusetts POST Commission Record for Rory M. Coleman (printout dated November 2025), showing:

- "Conduct Unbecoming - Officer secretly recorded other officers within restricted space of the department 22 separate times over a 10-day period."
- "Unreasonable Judgement (12 Counts) - Officer secretly recorded other officers without their knowledge. Officer confirmed he was aware recording another person without their knowledge constituted a felony."

**EXHIBIT 3**

Medical Documentation Supporting Disability Accommodation Request:

- Letter from Libby Flavin, LICSW (dated December 2024)

- Letter from Kelly Russell, LMHC (dated December 2024)


**EXHIBIT 4**

Civil Service Commission Appeal Documentation:

- Plaintiff's December 27, 2024 appeal filing (HRD portal submission)

- Deputy General Counsel Caroline De Luca's July 21, 2025 email stating CSC
  had "no record" of the appeal


**EXHIBIT 5**

Commissioner Michael Cox's Letter to Plaintiff dated October 17, 2025, threatening
"disciplinary action against you, including but not limited to, discharge."


**EXHIBIT 6**

Personnel Order 25-377 (October 24, 2025), promoting Richard Osberg to
Captain—seventy-nine (79) days after his statement that Plaintiff's forced retirement was
"because of what Michelle Wu wanted."


**EXHIBIT 7**

BPPA Attorney Kenneth Anderson's Email to Plaintiff dated November 3, 2025,
characterizing Plaintiff's recording as "multiple felonies," stating the hearing officer is
"hand-picked by the Commissioner," and concluding "Best of luck."

**EXHIBIT 8**

Involuntary Disability Retirement Application dated July 25, 2025, signed by Gina Edge-O'Leary, Sharon Dottin, and Lisa O'Brien under penalties of perjury, containing seven (7) provably false statements as detailed in para. 78 of this Complaint.


**EXHIBIT 9**

Public Records Request No. B003578-121125 dated December 11, 2025, seeking Giglio/Brady disclosure records, identification procedure documentation, internal review records, and disciplinary history for Officers Michael O'Dwyer and James Higgins, including records of participation in the Roxbury shooting investigation (Kelvin Thames) and *Commonwealth v. K.T.*


**EXHIBIT 10**

Plaintiff's Form 26 dated October 30, 2025 to Captain Wayne Lanchester, titled "Request for Investigation – Possible Violations of Rules 112, 113, and 204 Following Reports of Sexual Harassment and Discrimination," memorializing Lt. Osberg's August 6, 2025 statement that Plaintiff's forced retirement was "because of what Michelle Wu wanted."


**EXHIBIT 11**

Plaintiff's email dated December 7, 2025 to the Office of Administrative Hearings (Chiquera Connally White), with copies to BPD Legal Advisors Omar Bennani and David Fredette, as well as Joseph Gillespie, challenging the accuracy of the POST submission and the "felony" characterization. No substantive response received as of filing.

**EXHIBIT 12**

Occupational Health Correspondence dated August 11-20, 2025, including: (1) Gina Edge-O'Leary email requesting address update; (2) Plaintiff's August 14, 2025 response stating his injury arose from "sexual assaults, intimidation of a witness under color of law, and related retaliatory and other unlawful acts by Boston Police Department supervisors"; and (3) Chanel Bryant-Alexander's August 20, 2025 response, copying Lt. Richard Osberg, directing Plaintiff to "seek legal counsel" and stating Occupational Health "does not handle employee nor criminal complaints." This exhibit establishes that Osberg was on notice of Plaintiff's sexual assault claims.

## COMMONWEALTH OF MASSACHUSETTS

## COMMONWEALTH OF MASSACHUSETTS
### MIDDLESEX, SS.SUPERIOR COURT DEPARTMENT

CIVIL ACTION NO. 2581CV03118

RORY M. COLEMAN,
*Plaintiff*,

v.                                                      12/18/2025

CITY OF BOSTON, et al.,                     **RECEIVED**
*Defendants*.

## PLAINTIFF'S EMERGENCY MOTION FOR

## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Rory M. Coleman respectfully moves this Honorable Court, pursuant to

Mass. R. Civ. P. 65, for a Temporary Restraining Order and Preliminary Injunction against

Defendants, and in support states as follows:

### RELIEF SOUGHT

1. An Order enjoining Defendants City of Boston, Boston Police Department, and

Boston Retirement System from taking any further action on the pending involuntary

disability retirement application, including but not limited to scheduling hearings, approving

the application, or effectuating Plaintiff's separation from employment, pending resolution of

this action;

KB

2. An Order enjoining Defendant Massachusetts Peace Officer Standards and Training ("POST") Commission from publishing, maintaining, or disseminating the characterization of Plaintiff's conduct as involving a "felony" or any similar defamatory language, and requiring correction or removal of such characterization from Plaintiff's permanent record;

3. An Order enjoining the Boston Police Department from proceeding with any Rule 109 disciplinary hearing against Plaintiff until the merits of this action have been adjudicated;

4. Such other and further relief as this Court deems just and proper.

## GROUNDS FOR RELIEF

5. Plaintiff is a 19-year veteran Boston Police Officer who has been subjected to sexual assault, harassment, witness intimidation, and systematic retaliation for reporting misconduct.

6. Defendants have initiated involuntary disability retirement proceedings based on an application that Plaintiff believes contains seven demonstrably false statements, submitted without Plaintiff's consent.

7. Then-Lieutenant Richard Osberg stated that the forced retirement was proceeding "because of what Michelle Wu wanted," constituting direct evidence of political motivation and retaliation.

8. The POST Commission has published a characterization of Plaintiff's alleged conduct as involving a "felony" without any criminal charge, indictment, or conviction,

causing ongoing and irreparable damage to Plaintiff's professional reputation and career prospects.

9. Defendants transmitted their disciplinary findings to POST before affording Plaintiff any Rule 109 hearing under Boston Police Department rules, denying him the opportunity to challenge the factual basis before permanent damage was inflicted.

10. Plaintiff faces imminent and irreparable harm, including the loss of his 19-year pension eligibility, permanent damage to his POST certification record, and destruction of his law enforcement career, none of which can be adequately remedied by monetary damages.

## LEGAL STANDARD

11. A preliminary injunction is warranted where the moving party demonstrates: (1) a likelihood of success on the merits; (2) that irreparable harm will result if the injunction is not granted; (3) that the balance of harms favors the moving party; and (4) that the public interest will not be adversely affected. *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980). As set forth in the accompanying Memorandum of Law and Affidavit, Plaintiff satisfies all four factors.

## CONCLUSION

12. For the foregoing reasons, and as more fully set forth in the accompanying Memorandum of Law and Affidavit, Plaintiff respectfully requests that this Court grant emergency injunctive relief to preserve the status quo and prevent irreparable harm pending resolution of this action.

Respectfully submitted,

/s/Rory M. Coleman

Plaintiff, Pro Se

[Address Impounded]

Dated: December 18, 2025

## COMMONWEALTH OF MASSACHUSETTS
### MIDDLESEX, SS.
### SUPERIOR COURT DEPARTMENT

CIVIL ACTION NO. 2581CV03118

---

RORY M. COLEMAN,
    *Plaintiff,*

v.

CITY OF BOSTON, et al.,
    *Defendants.*

---

12/18/2025

**RECEIVED**

## MEMORANDUM OF LAW IN SUPPORT OF
## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

### INTRODUCTION

Plaintiff Rory M. Coleman, a 19-year veteran Boston Police Officer, seeks emergency injunctive relief to prevent Defendants from consummating a politically-motivated forced retirement, maintaining a defamatory "felony" characterization on his permanent record, and proceeding with disciplinary hearings designed to ratify predetermined outcomes. Then-Lieutenant Richard Osberg explicitly stated this action was taken "because of what Michelle Wu wanted." The City has already admitted in binding judicial proceedings that the factual basis for disciplinary action was incorrect. Plaintiff satisfies all four factors required for preliminary injunctive relief.

### STATEMENT OF FACTS

Plaintiff has served as a Boston Police Officer since November 2006, maintaining an exemplary service record for nearly two decades. In December 2022, Plaintiff reported that

KB

Sergeant Paul Zelvis had sexually assaulted him by thrusting his clothed genitals toward Plaintiff's face and body. Rather than investigate, the Boston Police Department ("BPD") retaliated.

On August 6, 2025, then-Lieutenant Richard Osberg told Plaintiff that the forced retirement was proceeding "because of what Michelle Wu wanted." This statement, documented in a BPD Form 26, constitutes direct evidence of political motivation rather than legitimate employment concerns.

The involuntary disability retirement application submitted to the Boston Retirement System contains seven demonstrably false statements, including claims of "restricted space" violations that the City itself admitted were factually incorrect in Massachusetts Commission Against Discrimination ("MCAD") proceedings. The City's Position Statement in MCAD Case No. 22BEM03412 admits at Paragraph 38: "[T]here was an error made by IAD in recording the complaint made by Sgt. Zelvis." At Paragraph 42, the City admitted the phone was visible.

The Massachusetts Peace Officer Standards and Training ("POST") Commission has published a characterization of Plaintiff's alleged conduct as involving a "felony," despite no criminal charge, indictment, or conviction. Defendants transmitted this characterization to POST before affording Plaintiff any BPD Rule 109 hearing. The Boston Police Patrolmen's Association ("BPPA") abandoned Plaintiff due to a conflict of interest arising from its endorsement of Mayor Wu's reelection campaign. When Plaintiff retained counsel to meaningfully participate in disciplinary proceedings, Defendants had already inflicted permanent damage to his record.

Plaintiff holds active POST certifications in both Massachusetts and California. The "felony" characterization threatens both certifications and permanently damages his ability to work in law enforcement anywhere in the United States.

## ARGUMENT

A preliminary injunction is appropriate when the moving party establishes: "(1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; (3) that the balance of equities favors granting the injunction; and (4) that the public interest will not be adversely affected." *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980).

## I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

Plaintiff's Complaint asserts fourteen counts under state law, including sexual harassment, hostile work environment, retaliation, whistleblower violations, civil rights violations under the Massachusetts Civil Rights Act, due process violations, and defamation. The likelihood of success is established by:

*Direct Evidence of Political Motivation:* Then-Lieutenant Osberg's statement that the forced retirement was "because of what Michelle Wu wanted" is direct evidence of improper motive. Under *Lipchitz v. Raytheon Co.*, 434 Mass. 493 (2001), direct evidence of discriminatory motive shifts the burden to the employer to demonstrate it would have made the same decision absent the improper motive.

*City's Binding Admissions:* The City admitted in MCAD proceedings that the Internal Affairs Division ("IAD") made errors in recording the complaint and that the phone was visible. These admissions are binding judicial admissions that undermine the entire factual predicate for discipline.

*Pattern Evidence:* The City has paid over $7.2 million in settlements for similar discrimination and retaliation claims, establishing a pattern of civil rights violations. This pattern evidence supports Plaintiff's claims under the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H, 11I.

*Due Process Violations:* Defendants transmitted findings to POST before affording Plaintiff any hearing, permanently damaging his record before he could challenge the factual basis. Under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), a public employee with a property interest in continued employment is entitled to notice and an opportunity to be heard before termination. Defendants denied Plaintiff this fundamental right.

## II. PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

The harm facing Plaintiff cannot be remedied by monetary damages alone:

*Loss of Pension:* Plaintiff has served 19 years toward a 20-year pension. Forced retirement now would deprive him of pension benefits earned over nearly two decades of service, one year before his twenty-year milestone. This loss cannot be undone after the fact.

*Permanent Record Damage:* The POST "felony" characterization is a permanent stain on Plaintiff's professional record. Every day it remains published, it compounds the damage to his reputation and career prospects nationwide.

*Career Destruction:* With a "felony" characterization on his POST record, Plaintiff cannot obtain employment in law enforcement anywhere. This is not a temporary setback. It is permanent career destruction. Two Attorney General appointees to the POST Commission, BPPA President Lawrence Calderone and BPD Sergeant Detective Eddy Chrispin, failed to intervene despite their knowledge of the circumstances and documented conflicts of interest.

*Imminent and Unpredictable Timing:* The Boston Retirement System could approve the pending application at any time. The absence of a scheduled date heightens, rather than diminishes, the urgency. Plaintiff has no way to know when the irreversible harm will occur.

## III. THE BALANCE OF HARMS FAVORS PLAINTIFF

Defendants lose nothing by maintaining the status quo pending adjudication. Plaintiff remains a sworn officer. No operational needs require immediate resolution. In contrast, Plaintiff faces the complete destruction of his 19-year career, loss of pension, and permanent reputational damage. Where "the potential harm to the plaintiff is catastrophic [and] the harm to the defendant from a stay is relatively slight," injunctive relief is warranted. *Commonwealth v. Mass. CRINC*, 392 Mass. 79, 89 (1984).

## IV. THE PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF

The public has a strong interest in preventing government retaliation against employees who report misconduct. The public also has an interest in ensuring that disciplinary proceedings comport with due process and that permanent professional records accurately reflect adjudicated facts rather than unproven allegations. Allowing Defendants to complete their predetermined course of action before Plaintiff can be heard undermines public confidence in the fairness of government employment practices.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court grant emergency injunctive relief: (1) enjoining Defendants from proceeding with the involuntary retirement; (2) enjoining the POST Commission from maintaining the "felony" characterization; and (3) enjoining the Rule 109 disciplinary hearing until the merits of this action are adjudicated.

Respectfully submitted,

/s/Rory M. Coleman

Plaintiff, Pro Se

[Address Impounded]


Dated: December 18, 2025

# 4.1

**COMMONWEALTH OF MASSACHUSETTS**
**MIDDLESEX, SS.**
**SUPERIOR COURT DEPARTMENT**

CIVIL ACTION NO. 2581CV03118

RORY M. COLEMAN,
*Plaintiff,*

v.

CITY OF BOSTON, et al.,
*Defendants.*

12/18/2025

**RECEIVED**

**AFFIDAVIT OF RORY M. COLEMAN**

I, Rory M. Coleman, being duly sworn, depose and state as follows:

1.  I am the Plaintiff in the above-captioned action. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently thereto.

2.  I am a Police Officer with the Boston Police Department, Badge #1419, Employee ID #102172, assigned to District D-14. I have served continuously since November 2006, nearly 19 years.

3.  I am an openly gay man and a member of the LGBTQ+ community.

KB

4. In December 2022, Sergeant Paul Zelvis sexually assaulted me by thrusting his clothed genitals toward my face and body, accompanied by sexually suggestive conduct. I reported this assault to the Boston Police Department.

5. Rather than properly investigate my complaint, the Department initiated a campaign of retaliation against me. Sergeant Mark Tobin seized my department-issued cell phone, claiming I had been "secretly recording" when in fact I was documenting harassment in plain view using a phone in a white marker case visible on my desk.

6. During an Internal Affairs Division ("IAD") investigation interview, Sergeant Detective Leah Bagas asked me, "How do we know you are gay?" This question was irrelevant to any legitimate investigative purpose and reflected discriminatory animus.

7. On August 6, 2025, then-Lieutenant Richard Osberg told me that the forced retirement was proceeding "because of what Michelle Wu wanted." This statement is documented in a Boston Police Department Form 26 dated on or about October 30, 2025. It constitutes direct evidence that my termination is politically motivated, not based on legitimate concerns about my fitness for duty.

8. It is my belief that an involuntary disability retirement application has been submitted to the Boston Retirement System on my behalf without my consent.

9. The City of Boston has admitted in the Massachusetts Commission Against Discrimination ("MCAD") Case No. 22BEM03412, Paragraph 38, that "[t]here was an error made by IAD in recording the complaint made by Sgt. Zelvis." At Paragraph

42, the City admitted the phone was visible. These multiple binding admissions

undermine the factual basis for the discipline underlying my forced retirement.

10. The Massachusetts Peace Officer Standards and Training ("POST") Commission has

published a characterization describing my alleged conduct as involving a "felony." I

have never been charged with, indicted for, or convicted of any felony. This

characterization is defamatory and has caused ongoing damage to my professional

reputation.

11. Defendants transmitted their disciplinary findings to POST before I was afforded any

Rule 109 hearing under Boston Police Department rules to challenge the underlying

facts. I was denied any opportunity to present evidence or cross-examine witnesses

before permanent damage was inflicted on my record.

12. I hold active POST certifications in both Massachusetts (valid through July 1, 2028)

and California (valid through October 2026). The "felony" characterization threatens

both certifications and my ability to work in law enforcement anywhere.

13. I have served nearly 19 years toward a 20-year pension. If the forced retirement

is approved before I reach 20 years, I will lose pension benefits I have earned

over nearly two decades of service. This harm cannot be undone once it occurs.

14. I do not know when the Boston Retirement System will act on the pending

application. There is no scheduled hearing date. The retirement could be

approved at any time without notice to me, causing immediate and irreversible

harm.

15. The Boston Police Patrolmen's Association, which has a duty to represent me, endorsed Mayor Wu's reelection campaign while simultaneously representing me in matters adverse to her administration. The union-provided attorney advised me that I was facing "multiple felonies" and wished me "best of luck" rather than providing effective representation.

16. I am in immediate danger of losing my career, my pension, and my professional reputation if Defendants are permitted to proceed with the forced retirement, maintain the POST characterization, and conduct Rule 109 proceedings while this matter is pending.

17. I request that this Court issue a Temporary Restraining Order to preserve the status quo until the merits of this action can be adjudicated.

Signed under the pains and penalties of perjury, this 18th day of December, 2025.

/s/Rory M. Coleman

Plaintiff, Pro Se

[Address Impounded]